[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11044
_____

D.C. Docket No. 2:10-cv-14046-DMM


WILLIAM REAVES,

Petitioner-Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 30, 2013)

Before TJOFLAT, CARNES, and MARCUS, Circuit Judges.

CARNES, Circuit Judge:

Despite his repeated assertions that he was "high" on cocaine at the time he

shot a law enforcement officer to death, the jury convicted the habeas petitioner in

this case of first-degree murder and sentenced him to death. Under Florida law,

first-degree murder requires a "premeditated design" to kill, which consists of a specific intent to kill coupled with premeditation. See Fla. Stat. § 782.04(1)(a); Anderson v. State, 276 So. 2d 17, 18 (Fla. 1973). As the case comes to us, the issue is whether there is a reasonable probability that the jury would have found the petitioner incapable of forming a premeditated design to kill had his trial attorney actively pursued a defense of voluntary intoxication.

## I.  FACTUAL BACKGROUND

In the early morning hours of September 23, 1986, William Reaves walked from his girlfriend's home to a nearby convenience store in Indian River County, Florida, where he placed three calls from a pay phone to a taxi service in order to get a ride home. Reaves grew impatient waiting for a taxi to arrive and, not having any more change to make another call, he dialed 911 shortly after 3:00 a.m., hoping to have the operator call a cab for him. For some reason he hung up the phone before speaking to the 911 operator.

Deputy Richard Raczkoski was dispatched to investigate the hang-up call. After arriving at the convenience store and talking with Reaves for a while, the deputy contacted the 911 dispatcher and learned that Reaves had no outstanding warrants. The deputy asked the operator to contact the taxi service and find out if one was coming for Reaves, and the operator confirmed that a taxi was on its way. All seemed to be going well.

2

But events sometimes tumble toward tragedy "as if the devil himself had shaved the dice."[1]  What tumbled in this case was a .38-caliber pistol, which had been concealed on Reaves but somehow slipped from the waistband of his short pants and fell to the ground.  The record does not show how that happened, but it does show that Reaves had prior felony convictions for conspiracy to commit robbery, for grand larceny, and for grand theft.  The record also shows that Reaves believed that if he were arrested and convicted for being a felon in possession of that firearm he would face mandatory prison time.  He did not want to go back to prison.

When Reaves reached for the pistol on the ground Deputy Raczkoski tried to stop him.  Reaves pushed the deputy, grabbed him by the throat, picked up the pistol, and pointed it in the deputy's face.  Pleading with Reaves not to kill him, the deputy managed to back away, turn, and run.  Reaves emptied the entire seven-round clip of his pistol, each shot requiring a separate pull of the trigger, and four of those shots struck the deputy, hitting him in the back.  As the deputy lay bleeding on the ground, he fired several shots from his weapon, but none of them hit Reaves.  Later that morning Deputy Raczkoski died on the operating table.

After the shooting, Reaves fled into dense woods behind the convenience store and made the seven-mile trek to the home of a friend, Erman Eugene Hinton,

---

[1] Rick Bragg, The Prince of Frogtown 177 (Alfred A. Knopf 2008).

all the while eluding a police manhunt that involved dozens of officers, a K-9 unit, and a police helicopter.  Reaves arrived at Hinton's home, woke him up, and asked to take a shower and for a change of clothes.  Hinton obliged.  According to Hinton's trial testimony,[2] Reaves told him that as the deputy attempted to draw his own weapon he had pointed the gun in the deputy's face and warned him, "I wouldn't do that if I were you."  Reaves recounted to Hinton how the deputy had pleaded for his life, begging Reaves not to shoot him, to which Reaves had responded:  "One of us got to go, me or you."  Hinton testified that he had no difficulty understanding Reaves, whose speech was not slurred and who appeared to be in full control of his faculties that morning.

Later that day Reaves offered a half ounce of cocaine to Jerry Bryant, his niece's husband, in exchange for a ride to a motel in Melbourne, Florida.  Bryant agreed and Reaves directed him to retrieve some cocaine that he had hidden in his mother's house.  After retrieving the cocaine, Bryant drove Reaves to a motel in Melbourne, some 30 to 40 miles away, and rented a room for Reaves to use.  On the afternoon of the following day, Reaves boarded a Greyhound bus for Albany, Georgia.  When he arrived there, Reaves was arrested by Georgia authorities, who had been notified that he was suspected of killing Deputy Raczkoski.

---

[2] Hinton testified at Reaves' first trial in 1987 but refused to testify at the 1992 retrial, even in the face of criminal contempt sanctions.  The trial court deemed Hinton unavailable to testify at the retrial and allowed his testimony from the earlier trial to be read into the record.

4

At the time of his arrest, which was not quite two full days after he killed the deputy, Reaves had four-and-a-half ounces of cocaine with him, at least a portion of which he intended to sell in order to finance his continued flight, and he also had a newspaper bearing the headline, "Indian River Deputy on Emergency Call Killed in Shooting." Reaves initially lied to the Georgia authorities, telling them his name was "Randy Martin" and giving them a false home address and place of employment. He did not appear to be intoxicated to any of the officers who encountered him.

Detectives from the Indian River Sheriff's Department arrived in Albany the following morning to interview Reaves. During a taped confession, which was later played for the jury at trial, Reaves admitted to shooting Deputy Raczkoski and recounted the incident, including his ensuing flight, in considerable detail. Reaves, however, told the officers that he had ingested an unspecified amount of cocaine before the incident, and he made over a dozen references to being "coked up," "high," and "wired out" at the time of the shooting. Although Reaves repeatedly blamed the shooting on drug-induced panic and paranoia, he also explained that he "couldn't let that officer get that gun" because he believed that, as a convicted felon, he was facing "a mandatory three years" for possessing a firearm. Reaves confirmed telling Hinton about the shooting, although he said that what he told Hinton was that he thought he had shot a police officer.

5

## II.  PROCEDURAL HISTORY

### A.  REAVES' TRIAL, RETRIAL, AND DIRECT APPEALS

Reaves was originally tried before a Florida jury in 1987, convicted of premeditated first-degree murder, and sentenced to death.  The Florida Supreme Court reversed that conviction because the State prosecutor had represented Reaves as a public defender in an earlier grand larceny case.  See Reaves v. State, 574 So. 2d 105, 106–08 (Fla. 1991).  At the outset of Reaves' 1992 retrial, Jonathan Jay Kirschner was appointed to represent him.  At defense counsel's request, the trial court reappointed Dr. William Weitz, the mental health expert who had examined Reaves before his first trial, to evaluate Reaves' competency to stand trial and sanity at the time of the offense, as well as to assist in the preparation of his defense.[3]  Dr. Weitz, a clinical psychologist specializing in military psychology and post-traumatic stress disorder, diagnosed Reaves as suffering from antisocial personality disorder, poly-substance abuse (particularly cocaine), and "Vietnam Syndrome," which he defined as a "sub-clinical" variety of PTSD characterized by rage reactions, alienation, hypervigilance, some depression, and a potential increase in drug and alcohol use.

---

[3] Reaves was represented by a different attorney, Clifford Barnes, at his original trial and in connection with that trial Dr. Weitz was appointed to evaluate Reaves with regard to issues of competency, insanity, and the need for involuntary hospitalization.  Barnes also had Dr. Weitz consider whether Reaves was able to form the intent required for first-degree murder, whether he was acting under the influence of extreme mental or emotional disturbance at the time of the shooting, and whether he had the capacity to either appreciate the criminality of his conduct or conform his actions to the requirements of the law.

During a pretrial deposition, Dr. Weitz testified that Reaves informed him that he "smoked and snorted" 1.75 grams of cocaine and consumed an unspecified amount of beer during the daytime or early evening before the shooting. He expressed the opinion that Reaves' judgment and perception "may have been impaired by the use of alcohol and drugs" at the time of the shooting, though he promptly clarified, "I'm not suggesting he was [legally] intoxicated or not, that I don't know. What I am suggesting is that the possibility of judgment and perception being impaired which is psychological phenomena and not legal, certainly are possible in this situation." Dr. Weitz also concluded that Reaves knew what he was doing at the time of shooting, understood the nature and consequences of his actions, and possessed the ability to distinguish right from wrong.

During the guilt phase of the retrial, defense counsel pursued a defense of excusable homicide, based largely on Reaves' Vietnam Syndrome, and tried to have Dr. Weitz's testimony admitted in support of that defense.[4] The proffered testimony of Dr. Weitz largely reiterated his deposition testimony. He acknowledged that the existence of Vietnam Syndrome, though accepted in "the psychological community," was not recognized as a disorder in the Diagnostic and

---

[4] A homicide is excusable under Florida law when, among other things, it is committed "by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation." Fla. Stat. § 782.03.

7

Statistical Manual of Mental Disorders, which is the authoritative diagnostic source for psychiatrists and psychologists.  Dr. Weitz also conceded that Reaves did not meet the criteria for a formal diagnosis of PTSD because, among other things, he did not report flashbacks or re-experiencing trauma.  Dr. Weitz was of the opinion that, as result of Vietnam Syndrome, Reaves was more likely to perceive his encounter with the deputy as life threatening, to exhibit diminished impulse control, and to react quickly to eliminate any perceived threat.  Still, he concluded that Reaves was not so intoxicated at the time of the offense that he was unable to distinguish right from wrong.  Reaves had immediately fled the scene of the shooting, had hidden in the woods, and had taken other evasive action, all of which indicated to Dr. Weitz that Reaves "knew what he was doing."

After hearing the proffered testimony of Dr. Weitz, the court barred it from the guilt phase of the 1992 retrial, ruling it inadmissible under Chestnut v. State, 538 So. 2d 820 (Fla. 1989).  The Chestnut decision had held that evidence of an abnormal mental condition that does not rise to the level of legal insanity is inadmissible for the purpose of proving that an accused either could not or did not possess the specific intent to commit an offense.  538 So. 2d at 820.

At the retrial Reaves' attorney did not present any evidence about the amount of drugs and alcohol that Reaves had consumed before the crime or the impact it would have had on his mental state.  Nor did he argue to the jury that

8

Reaves had been too intoxicated to form the premeditated design to kill that is required for first-degree murder. He did, however, request a jury instruction on that defense because of the statements in Reaves' confession about ingesting cocaine before the shooting. The trial court granted the request and instructed the jury that, while the use of drugs does not excuse the commission of a criminal act "to the extent that it merely arouses passions, diminishes perceptions, releases inhibitions or clouds reason and judgment," the jury should acquit Reaves of first-degree murder if it found that he had been "so intoxicated from the voluntary use of drugs as to be incapable of forming [the] premeditated design to kill." The court also instructed the jury on a number of lesser-included offenses of first-degree murder, including second-degree murder.

During closing arguments, the prosecutor discussed the issue of voluntary intoxication at length, arguing that Reaves' words, conduct, and underlying motives, especially as expressed in his statement, "One of us got to go, me or you," proved that he had made a conscious decision to kill the deputy in order to avoid prison time. He also argued that even if Reaves had consumed cocaine before the killing, Reaves was not so intoxicated that he was unable to formulate the premeditated intent to kill.

During his closing arguments, defense counsel did not expressly urge the jury to acquit his client of first-degree murder based on voluntary intoxication,

9

focusing instead on the defense of excusable homicide and the shortness of time to form a premeditated design.  Counsel did point out that in his confession Reaves had repeatedly referred to having used cocaine before the killing, and counsel argued that the case involved a panic shooting devoid of premeditation by a veteran of the Vietnam War.  After nine hours of deliberations, during which the jury asked the judge about the definition of premeditation and what would happen if it could not reach a verdict, Reaves was convicted of first-degree murder.

At the penalty phase of the trial, defense counsel called Dr. Weitz as an expert witness.  He testified much as his proffered testimony during the guilt stage had indicated that he would.  Dr. Weitz also told the jury that as a result of Vietnam Syndrome, coupled with his use of cocaine, Reaves was acting under the influence of extreme mental or emotional disturbance at the time of the shooting— namely, a heightened sense of panic and fear—which substantially impaired his ability to conform his conduct to the requirements of the law (a statutory mitigating circumstance).  Counsel also presented a number of witnesses who told the jury about Reaves' childhood, about his history of serious drug abuse dating back to his one-year tour of duty in Vietnam, and about the conditions of combat in Vietnam. The jury recommended a death sentence by a vote of ten to two and the trial judge followed that recommendation, finding that the aggravating circumstances of

10

Reaves' offense outweighed the mitigating circumstances.[5]  Reaves v. State, 639

So. 2d 1, 3 (Fla. 1994).  The Florida Supreme Court affirmed Reaves' conviction

and capital sentence on direct appeal.  Id. at 6.

### B.  REAVES' STATE COLLATERAL PROCEEDINGS

Reaves filed a state post-conviction motion under Fla. R. Crim. P. 3.850,

raising a total of 27 grounds for relief and requesting an evidentiary hearing.  In

relevant part, he claimed that his attorney was ineffective during the guilt phase of

his retrial for failing to investigate and pursue a voluntary intoxication defense,

particularly one based on the combined effects of his mental health problems and

substance abuse, in order to negate the intent required for first-degree murder.

Reaves specifically faulted counsel for failing to:  combine Dr. Weitz's opinion

with evidence of his voluntary intoxication; investigate and present corroborative

evidence of his intoxication at the time of the offense, including evidence of his

history of substance abuse; prepare Dr. Weitz to testify as to the impact of

substance abuse on his ability to form the necessary intent; and retain additional

---

[5] The trial court found three aggravating circumstances:  (1) Reaves was previously convicted of a felony involving the use or threat of violence to another person; (2) his capital offense was committed for the purpose of avoiding or preventing a lawful arrest; and (3) the offense was especially heinous, atrocious, or cruel.  See Reaves v. State, 639 So. 2d 1, 3 n.2 (Fla. 1994).  The court found no statutory mitigating factors but three non-statutory mitigating circumstances:  (1) Reaves was honorably discharged from military service; (2) he had a good reputation in his community up to the age of 16 (he was 37 years old at the time he murdered the deputy); and (3) he was a considerate son to his mother and good to his siblings.  Id. at 3 n.3.

On direct appeal, the Florida Supreme Court rejected the finding that Reaves' offense was especially heinous, atrocious, or cruel in comparison to other capital cases, but found that error of the trial court to be harmless in light of the other two aggravating factors and the "relatively weak mitigation."  Id. at 6.

mental health experts who could testify about his chronic substance abuse and mental health problems.

Reaves also claimed that counsel was ineffective during the penalty phase of the retrial for failing to adequately investigate and introduce additional mitigating evidence, including evidence relating to his impoverished childhood, military experience, drug addiction, contraction of a venereal disease in Vietnam, the murder of his sister shortly after he returned from Vietnam, and his efforts to assist a jail guard during a 1973 attack by two other inmates.

Along with his motion for collateral relief, Reaves submitted a 1999 affidavit from Hinton. In that affidavit, Hinton stated that Reaves "was all strung out" and "had been smoking crack and was pretty much out of his head" when he came to his house after the shooting, which contradicted Hinton's earlier testimony that Reaves had appeared to be in full control of his faculties.

The state trial court denied all of Reaves' claims without an evidentiary hearing. See Reaves v. State, 826 So. 2d 932, 936 (Fla. 2002). The Florida Supreme Court affirmed all but one of the summary denials, including the denial of Reaves' claim of ineffective assistance of counsel at the penalty phase. It concluded that the trial court had properly denied that claim without an evidentiary hearing because the proposed mitigation evidence was either irrelevant, cumulative of evidence already presented at sentencing, or would not have affected the balance

12

of aggravating and mitigating circumstances. Id. at 941. The Florida Supreme Court did, however, conclude that an evidentiary hearing was needed to resolve Reaves' claim that counsel was ineffective in failing to present a voluntary intoxication defense during the guilt phase of the trial, and it remanded the case for that purpose. Id. at 944.

### 1. The State Evidentiary Hearing

On remand, the state trial court held a three-day evidentiary hearing in March 2003 on Reaves' guilt phase ineffectiveness claim, during which Reaves called Kirschner, his counsel at the retrial, and six expert witnesses: Dr. Weitz, Dr. Richard Dudley, Dr. Barry Crown, Dr. Deborah Mash, Dr. Erwin Parsons, and Dr. Thomas Hyde.

Kirschner testified that before the retrial he was aware of Reaves' cocaine consumption and history of drug abuse and was certain that he had discussed the matter with Reaves, although he could not recall the specifics of their conversation, including whether they discussed a possible voluntary intoxication defense. Kirschner explained that, based on Dr. Weitz's diagnosis of Vietnam Syndrome, the primary focus of his defense effort had been excusable homicide, though he did not completely ignore a voluntary intoxication defense. While Kirschner repeatedly insisted that he had no recollection of what his thought process had been more than ten years earlier, he speculated that he had requested a jury instruction

13

on voluntary intoxication "to leave that as an option for the jury, a fall-back position," and added that "[s]ometimes there are defenses that you don't suggest, that you let the jury reach through their own logic."  He also noted that, at the time of the retrial, "jurors were less accepting of the idea that voluntary intoxication excuses criminal conduct."  Still, Kirschner could not recall why he had elected not to actively pursue a defense of voluntary intoxication "other than the fact that I was thinking excusable homicide was the right fit for the defense in this case . . . and what I should be presenting to the jury."

Kirschner acknowledged that a defense of excusable homicide was not necessarily inconsistent with a voluntary intoxication defense, although he noted that there could be some tension between the two defenses, stated that presenting a variety of defenses could lead the jury to believe that defense counsel was being disingenuous, and pointed out that some of the statements Reaves made during his confession indicated that he knew what he was doing at the time of the murder. Kirschner also noted that Dr. Weitz did not advise him about how cocaine may have affected Reaves at the time of the shooting, though he conceded that he could not recall whether he had specifically asked Dr. Weitz about the interactive effects of Vietnam Syndrome and cocaine use.  Kirschner further conceded that, while he questioned Reaves' family and friends about his history of drug abuse, he did not ask them about Reaves' drug use around the time of the shooting, did not request

14

the assistance of any other experts to help explain how drugs may have affected Reaves at the time, and did not request forensic drug testing on a marijuana cigarette and residue that were found at the home of Reaves' girlfriend following the shooting.

Dr. Weitz, who is not an attorney, testified that in his opinion Kirschner had pursued an excusable homicide defense that had been based on Dr. Weitz's own findings and "psychological perception" of the events, including his opinion that Reaves' military background had affected his behavior at the time. Dr. Weitz asserted that he could have testified in support of a voluntary intoxication defense at the retrial, but he had not been asked to evaluate whether Reaves was capable of forming the intent required for first-degree murder. In his opinion, Reaves had a "severe cocaine problem that would have impaired his ability to form specific intent," particularly in conjunction with his Vietnam Syndrome.[6] Dr. Weitz explained that the beer and 1.75 grams of cocaine that Reaves told him he had consumed during "almost a 24-hour period" before the shooting would have intensified the symptoms of Vietnam Syndrome, increasing Reaves' paranoia and suspiciousness, significantly distorting his perception and judgment, and enhancing

---

[6] Dr. Weitz testified that while he could have described the independent effects of drug and alcohol on Reaves' behavior and mental state, he believed the Vietnam Syndrome was a "critical factor" that helped explain Reaves' actions at the time of the shooting.

his reactivity so as to render him unable to form the specific intent to commit murder.

Although Dr. Weitz conceded that Reaves knew he was eliminating a threat when he fired at the deputy and admitted that Reaves' actions after the killing were a clear attempt to avoid being caught by law enforcement, he believed that Reaves' conduct during the shooting was a "conditioned reaction" to a distorted perception that his life was in mortal danger. He also testified that, while he was surprised by the detailed nature of Reaves' confession to the police, such a high level of recall was not necessarily inconsistent with the lack of specific intent at the time of the shooting. According to Dr. Weitz, while cocaine and alcohol impair information processing, Reaves' acuteness and sensitivity to detail would improve in a situation where he felt his life was at risk.

When asked whether Reaves' statement to the deputy, "One of us got to go," was itself inconsistent with his opinion that Reaves lacked specific intent, Dr. Weitz answered: "After the fact, I think it's very clear that he can say that he understood that he felt his life was threatened. That was exactly the situation, it was you or I, and I wasn't going to die. I think that's consistent with my opinion, not in contrast."[7]

---

[7] The apparent premise of Dr. Weitz's answer ("[a]fter the fact . . . he can say") is that Reaves made the statement after the killing, but the undisputed evidence is that he made the statement to the deputy before he shot him.

Dr. Dudley, a clinical and forensic psychiatrist, diagnosed Reaves with poly-substance dependence and PTSD, and he believed that Reaves was "acutely intoxicated with cocaine" at the time of the murder. Dr. Dudley was of the opinion that the combined effect of PTSD and acute intoxication prevented Reaves from being able to form the intent to kill the deputy. He explained that cocaine would have accentuated the paranoia and hypervigilance characteristic of PTSD, causing Reaves to respond reflexively without making a conscious decision to kill. Dr. Dudley also testified that Reaves' ability to recall the shooting with specificity was not inconsistent with the absence of intent, explaining that Reaves' "escalating hypervigilance" would have made him remarkably observant. Dr. Dudley conceded, however, that he was unaware of Reaves' statement, "One of us got to go," and admitted that he simply did not "know what to make of that."

Dr. Crown, a neuropsychologist, conducted a battery of tests on Reaves and concluded that he suffered from organic brain damage in a neural region associated with understanding the long-term consequences of immediate behavior. He did not know the origin, cause, or timing of the brain damage. Dr. Crown was of the opinion that Reaves' brain damage, aggravated by substance abuse, prevented him from forming the intent necessary for first-degree murder. He thought that the interaction between cocaine use and Reaves' underlying brain damage would have resulted in a phenomenon called "cocaine kindling," which causes a person to have

17

disrupted "reasoning, judgment, particularly short-term memory," and to become impulsive and paranoid. Although Dr. Crown emphasized that Reaves' cocaine use and brain damage, both individually and in tandem, would disrupt short-term memory, he would not concede that Reaves' ability to vividly recall the details of the murder was inconsistent with his opinion and asserted instead that "the relationship between brain function and behavior is much like a lamp with a faulty switch, sometimes it goes on and sometimes it goes off."

Dr. Mash, a neuropharmacologist, testified that Reaves had a long history of substance abuse dating back to the Vietnam War and was using cocaine "every day, all day" around the time of the shooting, which left him in a near constant state of being "hyperaroused, completely paranoid, [and] completely wired." In Dr. Mash's opinion, because of a "severe amount of cocaine abuse," Reaves was in a paranoid and "fully delusional" state of "cocaine psychosis" at the time of the shooting, which left him unable to accurately perceive the threat posed by the deputy, rationally react to the situation, or form the intent to commit first-degree murder. She believed that years of substance abuse had effectively "damaged" Reaves' brain, disengaging the frontal lobes (i.e., the reasoning portions of the brain that delay reaction) and fully activating the limbic system, or "reptilian part of the brain," which governs fight or flight responses. Dr. Mash also testified that cocaine exacerbates the symptoms of PTSD, including irritability and

hyperarousal, because both stimulate the same part of the brain, the amygdala. She said that, had she been asked in 1992, she would have testified that Reaves was in a "state of voluntary intoxication and would not have been able to form the intent to commit murder."

On cross-examination, Dr. Mash noted that Reaves told her that he ingested 10 grams of cocaine on the day of the shooting. She denied that there was anything unusual about Reaves' detailed description of the shooting in his confession, though her various explanations were somewhat contradictory. She initially testified that cocaine, while shifting perceptions of reality, makes people alert and does not "obliterate memory the way alcohol blackouts do." Yet, she also testified that short-term memory is "barred" when someone is hallucinating from the use of cocaine and, in her opinion, Reaves was hallucinating. Finally, Dr. Mash noted that clothing and hair taken from Reaves at the time of his arrest could be tested for the presence of drugs, but could not show the actual time that the drugs were used or in what quantities.

When questioned about Reaves' assertions in his confession that his actions were motivated by a desire to avoid returning to prison, as well as Hinton's testimony about Reaves' statements to the deputy, Dr. Mash testified that Reaves' confession was an attempt to rationalize his behavior in order to "make sense of something that went very badly." She did not, however, specifically explain the

19

significance of Reaves telling the deputy just before shooting him four times that one of them had to go.

Dr. Parsons, a clinical psychologist, testified that Reaves was suffering from PTSD and had a history of chronic substance abuse. In his opinion, Reaves was experiencing "dissociation" at the time of the murder, and the combined effects of PTSD, substance abuse, and dissociation rendered him incapable of forming the specific intent to kill the deputy. While Dr. Parsons agreed that Reaves' confession described the incident in "exquisite detail," he believed that the level of recall did not demonstrate that Reaves was capable of forming specific intent because memory "becomes extremely sharp" in the "context of trauma." When asked whether Reaves' statements to the police regarding his motive for the shooting indicated that he made a conscious decision to kill the deputy, Dr. Parsons merely stated that there was a possible "different interpretation" of those statements. But he did not disclose what that different interpretation was.

Dr. Hyde, a behavioral neurologist, testified that Reaves had a history of poly-substance abuse, particularly involving alcohol and cocaine; major recurring depression; strong elements of PTSD; and a head injury, which was either caused by prolonged substance abuse or sustained shortly after Reaves' arrest as a result of an alleged police beating. He did not, however, give a specific opinion about Reaves' mental state at the time of the shooting. He simply suggested that, if

20

Reaves' head injury had preceded the shooting, it would have left Reaves disinhibited, impulsive, and prone to rash behaviors in combination with acute intoxication. Dr. Hyde acknowledged that Reaves' confession to the police was "pretty exquisite" in terms of detail and was of the opinion that, if those details were accurate, it was unlikely that Reaves was confabulating.

In response to Reaves' expert witnesses, the State called psychiatrist Dr. McKinley Cheshire, who had testified during the penalty phase of Reaves' 1992 retrial. Dr. Cheshire concluded that Reaves "knew what he was doing" at the time of the shooting and made a conscious decision to kill the deputy. In particular, he testified that Reaves' statements to the police that he shot the deputy because he was facing a mandatory prison term for unlawfully possessing a firearm showed that Reaves was "thinking, calculating, considering the facts of the matter . . . and the outcome of his behavior." Dr. Cheshire diagnosed Reaves with antisocial personality disorder, which was consistent with his calculated decision to murder the deputy in order avoid jail time.

During the course of the remand proceedings, Reaves moved for forensic testing of the clothing and hairs recovered by the police to determine the presence and concentration of drugs. The State responded that forensic testing was unnecessary because Weitz's unrebutted testimony from the time of trial was that Reaves had ingested 1.75 grams of cocaine before the shooting and "no one [was]

21

contesting that [Reaves] was a chronic drug user." In denying Reaves' request, the state trial court noted that "[t]he State has all but stipulated that [Reaves] ingested cocaine on the date of the incident" and that it was "uncontroverted that [Reaves] was a drug addict and ingested cocaine" before the shooting.

Based on the evidence presented at the hearing, the state trial court rejected Reaves' ineffective assistance claim, finding that counsel did not render constitutionally deficient performance in failing to actively pursue a voluntary intoxication defense and retain experts who could testify about the combined effects of Reaves' substance abuse and mental conditions.

## 2. The Florida Supreme Court's Decision

The Florida Supreme Court affirmed the trial court's ruling, concluding that counsel rendered reasonably effective representation in light of "the record at retrial, the facts of the case, the law in Florida at the time, and counsel's experience and knowledge of the case." Reaves v. State, 942 So. 2d 874, 878 (Fla. 2006). The court noted that, in order to assert a viable voluntary intoxication defense, Reaves had to "present evidence of intoxication at the time of the offense that would show his inability to form the requisite specific intent," not merely evidence of a history of drug abuse. Id. at 879. The court then emphasized that: (1) other than his own assertions of being "high," Reaves did not present any "direct evidence" to show his level or state of intoxication at the time of the murder; (2)

22

Reaves' expert witnesses had no objective evidence to support their opinions that he was intoxicated at the time of the shooting; (3) Reaves' other statements to the police, including his detailed account of the circumstances of the crime, indicated that "he knew exactly what he was doing at the time of the shooting," which essentially "negated any voluntary intoxication defense that trial counsel could have presented on [his] behalf"; and (4) Hinton's trial testimony, insofar as it quoted Reaves as telling the officer, "One of us got to go," and indicated that Reaves appeared to be in full control of his faculties after the shooting, "further negated the use of a voluntary intoxication defense."[8] Id. at 879–80.

The Florida Supreme Court also underscored the point that under its Chestnut decision, which was the law in effect at the time of the 1992 retrial, Reaves could not have offered evidence of the combined effect of intoxication and a mental defect to support a voluntary intoxication defense. Id. at 880. Offering combined effect evidence was not permitted, the court explained, until State v. Bias, 653 So. 2d 380 (Fla. 1995), which was decided three years after Reaves' retrial. Id. Based on these considerations, coupled with trial counsel's testimony at the evidentiary hearing, the Florida Supreme Court found that counsel made a "strategic choice of excusable homicide as a defense over involuntary intoxication"

---

[8] As we explain later, the Florida Supreme Court properly discounted the relevance of Hinton's 1999 affidavit on the issue of counsel's ineffectiveness because Hinton refused to testify at the 1992 retrial, which means that the information contained in the later affidavit was not available at the time of the retrial. See Reaves, 942 So. 2d at 881–82.

which was "reasonable under the facts of the case and the law at the time," and as a result, counsel's performance was not deficient under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). Id. at 880–81. Given the lack of deficient performance, the court did not address Strickland's prejudice prong. Id. at 881.

## C. REAVES' FEDERAL HABEAS PROCEEDINGS

After his state post-conviction proceedings, Reaves filed a 28 U.S.C. § 2254 federal habeas petition claiming, among other things, that trial counsel had rendered ineffective assistance at the guilt phase of his retrial by failing to investigate, prepare, and present a voluntary intoxication defense. He contended that if counsel had introduced expert or lay testimony in support of a voluntary intoxication defense, it would have shown that he was incapable of forming the intent required for first-degree murder and resulted in a conviction for second-degree murder instead. Reaves also contended that counsel had rendered ineffective assistance during the penalty phase of the retrial by failing to investigate and present evidence of his impoverished childhood, military experience and combat-related PTSD, and substance abuse.

The district court granted relief on Reaves' guilt phase claim of ineffective assistance of counsel involving a voluntary intoxication defense and ordered a new trial. The Florida Supreme Court's rejection of that claim, according to the district court, was based on an unreasonable determination of the facts. See generally 28

24

U.S.C. § 2254(d)(2).  Chief among those unreasonable findings, the district court believed, was the finding that there was no direct evidence that Reaves was intoxicated at the time he shot the deputy.  The district court acknowledged that Reaves' own statements to the officers that he had ingested cocaine on the day of the killing may have been the only evidence that he had been intoxicated.  But the court pointed out that, according to the state trial court, the State had not disputed those statements.  The district court also rejected the Florida Supreme Court's finding that trial counsel had made a strategic decision not to pursue a voluntary intoxication defense.  It did so based on counsel's failure to offer a specific strategic reason for not pursuing that defense and his failure to recall whether he had discussed it with Reaves.  Reaves had, the district court concluded, established the deficiency prong of his guilt stage ineffective assistance of counsel claim.

The district court also concluded that Reaves had satisfied the prejudice prong of Strickland because there was a reasonable probability that a voluntary intoxication defense would have prevented a first-degree murder conviction.  In reaching that conclusion, the district court emphasized both the "tragic and bizarre" circumstances of the case and the expert testimony that the combination of Reaves' cocaine use and underlying mental problems rendered him unable to form the premeditated design required for first-degree murder.  Based on its own review and interpretation of Florida law, which contradicted the view of the Florida

25

Supreme Court, the district court concluded that evidence about the combined effect of Reaves' mental defects and cocaine use would have been admissible to support a voluntary intoxication defense. The district court also pointed to the length of the jury deliberations and the jury's questions about a hung jury and the element of premeditation, which the court surmised reflected "indecision and concerns about whether the requisite intent for first degree murder had been established."

In addition to granting relief on the guilt phase claim, the district court ordered an evidentiary hearing on Reaves' penalty phase claim in order to determine the extent of additional mitigating evidence that could have been presented to the jury and to assess whether the Florida Supreme Court reasonably found that such evidence would have been irrelevant or cumulative. The court, however, stayed the evidentiary hearing pending the result of any appeal of its decision of Reaves' guilt phase claim.

The State filed timely motions for reconsideration under Fed. R. Civ. P. 59(e) and Fed. R. Civ. P. 60, both of which the district court denied. The State then filed this appeal.

### III.  LEGAL ANALYSIS

When reviewing a district court's grant or denial of habeas relief, "we review questions of law and mixed questions of law and fact <u>de novo</u>, and findings

of fact for clear error." Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000).

To prevail on a claim of ineffective assistance of counsel, a petitioner must show

both that: (1) counsel's performance was deficient, meaning that it "fell below an

objective standard of reasonableness"; and (2) the deficient performance

prejudiced the defense. Strickland, 466 U.S. at 687–88, 104 S.Ct. at 2064.

Ordinarily, federal habeas review of claims adjudicated on the merits in state court

is greatly circumscribed by the Antiterrorism and Effective Death Penalty Act of

1996, which precludes relief unless the state court's decision involved an

unreasonable application of clearly established federal law or was based on a

unreasonable determination of the facts. 28 U.S.C. § 2254(d). However, because

the Florida Supreme Court did not reach the issue of prejudice there is no decision

on that issue to which we could defer. See Johnson v. Sec'y, Dep't of Corr., 643

F.3d 907, 930 (11th Cir. 2011).

### A.  GUILT PHASE INEFFECTIVENESS

The State contends that, in granting habeas relief on Reaves' guilt phase

claim of ineffective assistance, the district court failed to afford proper AEDPA

deference to the Florida Supreme Court's factual findings, particularly its

determination that Reaves did not present any direct evidence of his level of

intoxication at the time of the murder. Under Florida law, the State insists,

Reaves' "self-serving" statements to the police and to his experts about his cocaine

27

use on the night of the murder were not "substantive evidence" of intoxication that could support a voluntary intoxication defense.  See Henry v. State, 862 So. 2d 679, 682–83 (Fla. 2003); Holsworth v. State, 522 So. 2d 348, 352 (Fla. 1988).  The State also maintains that, despite Reaves' assertions that he was "high" at the time of the murder, there was ample evidence he knew what he was doing when he shot the deputy, fled the scene, and evaded law enforcement, and that expert testimony about the combined effect of intoxicants and a mental condition could not support a voluntary intoxication defense under Florida law at the time of Reaves' retrial.  For those reasons, the State contends, Reaves has not only failed to show that trial counsel rendered deficient performance in not actively pursuing a voluntary intoxication defense, but has also failed to show that he was prejudiced by counsel's actions.

Because we are convinced that Reaves has not carried his burden of demonstrating prejudice, we need not decide whether the district court failed to afford the required deference to the Florida Supreme Court's decision that there was no deficient performance.[9]  See Windom v. Sec'y, Dep't of Corr., 578 F.3d

---

[9] We note, however, that the district court's decision that there was deficient performance was based on two fundamental flaws.  For one thing, the district court mistook counsel's understandable lack of memory about what he may have been thinking at the time of the retrial, which occurred more than a decade before he testified at the post-conviction hearing, for the absence of a reasoned basis for electing not to actively pursue a voluntary intoxication defense.  See Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228, 1245 (11th Cir. 2011) (explaining that our binding precedent does not give the petitioner "the benefit of trial counsel's short memory"; instead, we presume that trial counsel exercised reasonable professional judgment); Williams v.

28

1227, 1248 (11th Cir. 2009) ("Because the failure to demonstrate either deficient performance or prejudice is dispositive . . . , there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one.") (quotation marks and alteration omitted).

To prove prejudice a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," id., and the "likelihood of a different result must be substantial, not just conceivable," Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 792 (2011). The inquiry into prejudice requires us to evaluate "the totality of the evidence—both that adduced at

---

Head, 185 F.3d 1223, 1227–28 (11th Cir. 1999) (recounting that the trial had been ten years ago, counsel had lost his case file, and he could not remember what had happened in the case, and concluding that "where the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment").

For another thing, the district court's emphasis on counsel's failure to articulate a specific strategic reason for not focusing on voluntary intoxication as a defense placed undue weight on counsel's subjective reasons for acting as he did. As we have explained, Strickland calls for an objective inquiry into the reasonableness of counsel's performance and, for that reason, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). The relevant question is whether "some reasonable lawyer" could have pursued the challenged course of action, regardless of whether the petitioner's trial counsel actually made a deliberate, informed, and strategic decision to do so. See id. at 1315 n.16 (emphasis added); see also Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 790 (2011) ("The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking. . . . Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.") (emphasis added).

trial, and the evidence adduced in the habeas proceedings." Wiggins v. Smith, 539

U.S. 510, 536, 123 S.Ct. 2527, 2543 (2003) (quotation marks, brackets, and

emphasis omitted).

At the time of Reaves' 1992 retrial, voluntary intoxication could be asserted

as a defense in Florida to specific intent crimes such as first-degree murder, but not

to crimes like second-degree murder that can be established with either general or

specific intent.[10] See Gardner v. State, 480 So. 2d 91, 92 (Fla. 1985); Gentry v.

---

[10] Effective October 1, 1999, Florida statutorily abolished the defense of voluntary intoxication, though that defense apparently remains available to defendants whose crimes predate that legislation's effective date. See Fla. Stat. Ann. § 775.051 (1999); Travaglia v. State, 864 So. 2d 1221, 1223 (Fla. 5th DCA 2004). Florida is one of a number of states that have abolished the defense of voluntary intoxication in the past several decades, responding to statistics linking violent crime with self-induced intoxication, and to criticisms that the defense perversely rewards intoxicated behavior by reducing criminal punishment and contradicts widespread moral notions that a person who voluntarily impairs his own faculties should be held fully accountable for the consequences. See Montana v. Egelhoff, 518 U.S. 37, 48–50, 116 S.Ct. 2013, 2018–20 (1996) (discussing the trend towards abolition of the defense and the justifications for doing so); Meghan Paulk Ingle, Note, Law on the Rocks: The Intoxication Defenses Are Being Eighty-Sixed, 55 Vand. L. Rev. 607, 614–16, 622–26 (2002) (same); Bias, 653 So. 2d at 384 (Grimes, C.J., concurring) (urging the Florida legislature to abolish the voluntary intoxication defense and stating, "I cannot understand why a person should be exonerated of a specific intent crime simply because he drank too much").

This historical trend marks a return to the common law view, prevalent on both sides of the Atlantic until the late nineteenth century, that intoxication neither justifies nor mitigates criminal conduct. See Egelhoff, 518 U.S. at 44–47, 116 S.Ct. at 2018–20. As Justice Story remarked nearly two centuries ago:

> If the prisoner was at the time of committing the offence, intoxicated, as his counsel have earnestly contended, I cannot perceive how it can, in point of law, help his case. This is the first time, that I ever remember it to have been contended, that the commission of one crime was an excuse for another. Drunkenness is a gross vice, and in the contemplation of some of our laws is a crime; and I learned in my earlier studies, that so far from its being in law an excuse for murder, it is rather an aggravation of its malignity.

United States v. Cornell, 25 F. Cas. 650, 657–58 (C.C.R.I. 1820) (Story, J.).

State, 437 So. 2d 1097, 1099 (Fla. 1983). Mere use of intoxicants, however, even to the extent that they "arouse[d] passions, diminishe[d] perceptions, release[d] inhibitions or cloud[ed] reason and judgment," was not enough to support a voluntary intoxication defense. See Fla. Std. Jury Instr. (Cr.) 3.04(g) (1987). Instead, a defendant was required to "come forward with evidence of intoxication at the time of the offense sufficient to establish that he was <u>unable to form the intent necessary to commit the crime charged</u>." Linehan v. State, 476 So. 2d 1262, 1264 (Fla. 1985) (emphasis added); <u>see also</u> Fla. Std. Jury Instr. (Cr.) 3.04(g) (1987) (providing that a defendant must be so intoxicated that he or she was "incapable of forming" the required mental state for a crime). The required mental state for first-degree murder is a "premeditated design" to kill, which requires a specific intent to kill coupled with premeditation.[11] See Fla. Ann. Stat. §

---

[11] Florida courts sometimes phrase the voluntary intoxication inquiry in terms of whether the defendant was so intoxicated that he lacked the specific intent to kill, which could be interpreted to mean that the mental state required for first-degree murder is a specific intent to kill and nothing more. See Henry v. State, 948 So. 2d 609, 626–27 (Fla. 2006); Patton v. State, 878 So. 2d 368, 373 (Fla. 2004); Jones v. State, 855 So. 2d 611, 616 (Fla. 2003). When it has specifically focused on the matter, however, the Florida Supreme Court has clarified that the mental state required for first-degree murder is not merely a specific intent to kill but also premeditation, making premeditation the feature that distinguishes first- from second-degree murder. See Anderson, 276 So. 2d at 18 (explaining that the "specific intent to kill" may be present in either first- or second-degree murder, and that "the one essential element which distinguishes [the two] is premeditation"); Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001) (describing premeditation as "more than a mere intent to kill; it is a fully formed conscious purpose to kill").

For purposes of the voluntary intoxication defense, the question is whether the defendant was "unable to form the intent necessary to commit the crime charged." Linehan, 476 So. 2d at 1264. Combining these threads of law with the prejudice requirement, the question before us is whether there is a reasonable probability that the jury, if presented with a voluntary intoxication

31

782.04(1)(a); Anderson, 276 So. 2d at 18 (explaining that second-degree murder requires either a general or specific intent to kill, while first-degree murder requires both a specific intent to kill and premeditation, which is "the one essential element which distinguishes first-degree murder from second-degree murder"); Davis v. State, 928 So. 2d 1089, 1118 (Fla. 2005) (evaluating whether a voluntary intoxication defense to a charge of first-degree murder "could have rebutted the necessary elements of specific intent and premeditation").  Premeditation is defined as not "a mere intent to kill," Bradley v. State, 787 So. 2d 732, 738 (Fla. 2011), but as a "fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act," Asay v. State, 580 So. 2d 610, 612 (Fla. 1991).

There are two reasons we are convinced that Reaves has failed to carry his burden of demonstrating a substantial likelihood of a different result had trial counsel actively pursued a voluntary intoxication defense with all of the evidence, including the expert testimony, that was presented at the state court evidentiary hearing.  The first is that most, if not all, of the expert testimony supporting the defense would have been inadmissible at Reaves' retrial.  While the Florida Supreme Court, in affirming the denial of state collateral relief, based its decision

---

defense, would have found that when he killed the deputy Reaves was incapable of forming the requisite mental state for first-degree murder—the premeditated design to kill.

32

on the absence of deficient performance, one of the primary reasons it articulated in support of that determination was "the law in Florida at the time" of Reaves' 1992 retrial.  Reaves, 942 So. 2d at 878.  The state high court made clear that state law, as it existed at the time of the retrial, precluded a voluntary intoxication defense based on the combined effect of intoxication and an underlying mental condition that did not rise to the level of legal insanity.  Id. at 880.  The Florida Supreme Court's interpretation of state law is binding on federal courts.  The district court should not have substituted its own interpretation of state law for that of Florida's highest court.  See, e.g., Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  The United States Supreme Court has instructed us that "state courts are the ultimate expositors of state law" and federal courts "are bound by their constructions" except in rare and extreme circumstances.  Mullaney v. Wilbur, 421 U.S. 684, 691 & n.11, 95 S.Ct. 1881, 1886 & n.11 (1975). And we have held, in another capital murder case, that we were bound by the Florida Supreme Court's determination that a particular type of voluntary intoxication defense was not cognizable at the time of the petitioner's trial.  Pietri v. Fla. Dep't of Corr., 641 F.3d 1276, 1284 (11th Cir. 2011) (emphasizing that "[a] state supreme court's interpretation of its law is binding on federal courts").  That decision applies here.

33

Given the state of the law at the time of Reaves' retrial, as conclusively construed by the Florida Supreme Court, the expert opinions of Dr. Dudley, Dr. Crown, Dr. Parsons, and Dr. Hyde would have been inadmissible because those opinions were premised not on cocaine use alone, but on the combined effect of cocaine use and an underlying mental condition, whether PTSD, brain damage, or poly-substance abuse, that did not rise to the level of legal insanity. Likewise, Dr. Mash's conclusion that Reaves would not have been able to form the mental state required for first-degree murder was not based as much on the amount of cocaine Reaves allegedly ingested on the day of the shooting, as it was on the effect that years of chronic substance abuse had on his neurological functioning. The Florida Supreme Court has consistently held that evidence of a mental defect caused by chronic drug abuse, including so-called "cocaine psychosis," is inadmissible under state law for the purpose of establishing a voluntary intoxication defense. See Pietri v. State, 885 So. 2d 245, 252 (Fla. 2004) (noting that the Florida Supreme Court has consistently held that evidence of "metabolic intoxication" due to persistent drug use is inadmissible at trial to prove a lack of specific intent); Spencer v. State, 842 So. 2d 52, 62–63 (Fla. 2003) (concluding that evidence of a defendant's "dissociative state" resulting, in part, from a long history of alcohol abuse and "the residual effects of a two-week alcoholic binge" would not have been admissible during the guilt phase of the defendant's trial); Street v. State, 636

34

So. 2d 1297, 1301 (Fla. 1994) (holding that, because the defendant was not raising an insanity defense, the trial court properly refused to permit a defense expert to testify that the defendant was suffering from "the mental infirmity of cocaine psychosis" at the time of his offense).

Even Dr. Weitz, who claimed that he could describe the independent effects of the 1.75 grams of cocaine and alcohol Reaves allegedly consumed before the shooting, largely premised his opinion on the interplay between cocaine and Vietnam Syndrome, which he characterized as a "critical factor" in accounting for Reaves' actions. Thus, with the possible exception of some limited parts of Dr. Weitz's testimony, the opinions of Reaves' experts would, as a matter of Florida law, have been inadmissible to demonstrate that he was incapable of forming the premeditated design to kill that is required for first-degree murder.

The second reason we are convinced that Reaves has failed to carry his burden of proving a reasonable probability of a different result if a voluntary intoxication defense had been pursued is all of the evidence showing that he not only was capable of formulating a premeditated design to kill the deputy, but also actually did so. His undisputed actions and statements before and after the murder prove that he possessed the presence of mind to make a conscious and purposeful decision to kill the deputy, which negates a voluntary intoxication defense. Reaves told the officers who questioned him that he had shot the deputy because he

35

believed that, as a convicted felon, he was facing a mandatory sentence for unlawfully possessing a firearm, and he did not want to go back to prison. Those facts, which are not contradicted by any evidence, prove that Reaves' actions were deliberate and motivated by a desire to avoid going back to prison. There is also the fact that he fired his weapon at the deputy seven times and hit him four times. See Woods v. State, 733 So. 2d 980, 985 (Fla. 1999) (explaining that, under Florida law, premeditation may be inferred from "the nature of the weapon used, . . . the manner in which the homicide was committed, and the nature and manner of the wounds inflicted") (quotation marks omitted) (emphasis added).

Reaves had the presence of mind and mental capacity to immediately flee the area of the shooting, hide in the woods, and take other evasive action in order to avoid a sizeable police manhunt as he traveled seven miles on foot. And as soon as he arrived at Hinton's home he showered and changed his clothes. Reaves' ability to later recall the incident in considerable and vivid detail is more evidence weighing against a voluntary intoxication defense. See Davis v. State, 875 So. 2d 359, 367 (Fla. 2003) (concluding that a defendant's detailed confession about the circumstances of his crime "substantially undermined the viability of a voluntary intoxication defense").

The single most damaging piece of evidence presented at the retrial was Hinton's testimony (read into evidence) about Reaves' explanation for why he had

36

killed the deputy. He recounted to Hinton how, as the deputy was pleading for his life, Reaves had told him, "One of us got to go, me or you." That is an articulation of a premeditated design to kill, pure and simple. Hinton also testified that Reaves appeared to be in full control of faculties as he described the incident. Hinton's uncontradicted testimony, particularly about what Reaves told him, proves that Reaves was "conscious of the nature of the act he [was] about to commit and the probable result of that act," which rules out a finding that he was too intoxicated to form the intent required for first-degree murder. See Asay, 580 So. 2d at 612.[12] Even assuming that Reaves' experts would not have been precluded from testifying at the retrial, none of them was able to adequately explain how Reaves could have been unable to form a premeditated design to kill in light of his statement to the deputy that he was going to shoot him because one of them had to go.

Having heard the evidence presented at the retrial, including Reaves' repeated references to being "high" on cocaine at the time of the shooting, and having received an instruction on the defense of voluntary intoxication, the jury concluded that Reaves was guilty of first-degree (premeditated) murder. We are not persuaded that there is a reasonable probability that the jury would have

---

[12] Although Hinton's 1999 affidavit, in contradiction to his 1987 trial testimony, described Reaves as "all strung out" and "out of his head" after the shooting, that affidavit has no bearing on the question of prejudice. It did not even exist until seven years after the retrial. Despite the prosecutor's and the trial court's best efforts, Hinton refused to testify at the 1992 retrial, which led to the introduction of his trial testimony. Cf. Wlliamson v. Moore, 221 F.3d 1177, 1181 (11th Cir. 2000) ("Counsel cannot be said to be ineffective for failing to call an unavailable witness.").

reached a different result had counsel actively pursued a voluntary intoxication defense. As the Florida Supreme Court aptly pointed out, Reaves' actions indicate that he "knew what he was doing." See Reaves, 942 So. 2d at 880.

Unlike the district court, we are not convinced that Reaves' actions were bizarre, at least not bizarre enough to support a finding that he lacked the ability to form a premeditated design to take the deputy's life. The decision by Reaves, who was out of coins, to dial 911 for help in securing a cab was ill advised in light of the fact that he was a felon in possession of a firearm. His decision to immediately hang up may indicate that he realized that was not a wise course of action. But people sometimes make bad decisions and do stupid things. While a defendant's decision to kill a police officer to avoid arrest and a jail sentence is a bad decision, a stupid decision, an immoral decision, and a criminal decision, it is not bizarre enough to establish that Reaves lacked the ability to form a premeditated design to kill. Because Reaves has failed to carry his burden of proving that he was prejudiced by trial counsel's failure to pursue a voluntary intoxication defense, the district court erred in granting federal habeas relief on his guilt phase claim of ineffective assistance of counsel. It should have denied relief on that claim.

## B. PENALTY PHASE INEFFECTIVENESS

The State also challenges the district court's decision to grant an evidentiary hearing on Reaves' penalty phase claim of ineffective assistance of counsel.

Although neither party contests our jurisdiction to review that aspect of the district court's judgment, "we are obligated to address jurisdictional questions sua sponte" whenever jurisdiction may be lacking.  Thomas v. Blue Cross and Blue Shield Ass'n, 594 F.3d 814, 818 (11th Cir. 2010) (quotation marks omitted).

As a general principle, our jurisdiction is limited to reviewing "final decisions" of district courts, 28 U.S.C. § 1291, meaning those that "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment," Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983) (quotation marks omitted).  In the context of habeas proceedings, however, we have held that a judgment granting a writ of habeas corpus on less than all grounds asserted in a petition is a final, appealable decision within the meaning of § 1291.  Wilson v. Kemp, 777 F.2d 621, 622 (11th Cir. 1985).  Nonetheless, that does not mean that every action taken by a district court in conjunction with granting a habeas petition constitutes an appealable final decision.  Cf. Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 38, 115 S.Ct. 1203, 1206 (1995) (holding that there was interlocutory appellate jurisdiction to review the district court's denial of summary judgment based on qualified immunity to individual officers, but not the district court's denial of the county commission's motion for summary judgment).

In and of itself, the district court's grant of an evidentiary hearing on Reaves' penalty phase ineffective assistance claim does not constitute a final

39

decision on the merits.  See Broussard v. Lippman, 643 F.2d 1131, 1133 (5th Cir. Unit A Apr. 1981) ("When . . . a district court anticipates that further proceedings on substantive matters may be required, any order it makes to facilitate those further proceedings is necessarily not final.").[13]  Had the district court rejected Reaves' guilt phase claim on the merits but granted an evidentiary hearing on the penalty phase claim, we would not hesitate to classify the resulting decision as interlocutory.  We see no reason to treat the district court's decision to conduct an evidentiary hearing on the sentence stage claim as final and immediately appealable simply because the court granted Reaves' habeas petition on a guilt stage claim.

Apart from final decisions, we may exercise appellate jurisdiction over certain interlocutory rulings that fall within 28 U.S.C. § 1292 or the collateral order doctrine.  The district court's grant of an evidentiary hearing, however, does not fit under § 1292, see 28. U.S.C. § 1292(a)-(b), nor does it satisfy the requirements of the collateral order doctrine, which applies only to non-final decisions that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment," Wajnstat v. Oceania Cruises, Inc.,

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

40

684 F.3d 1153, 1156 (11th Cir. 2012) (quotation marks omitted).  The court's grant of an evidentiary hearing is not completely separate from the merits of Reaves' penalty phase claim and, should the district court ultimately grant relief on that claim, the State will have an opportunity to challenge the propriety of the district court's action in conducting an evidentiary hearing on the claim.  If such a challenge occurs and is successful, any evidence admitted at the evidentiary hearing will have to be disregarded; were it otherwise, there would be no way to enforce the restrictions imposed by 28 U.S.C. § 2254(e)(2).

Under the doctrine of pendent appellate jurisdiction, we may also review an otherwise non-appealable decision that is "inextricably intertwined" with an appealable decision or when "review of the former decision is necessary to ensure meaningful review of the latter."  Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (quotation marks and alteration omitted).  The issue of whether the district court properly granted an evidentiary hearing on Reaves' penalty phase claim is not "inextricably intertwined" with the merits of its decision on his distinct guilt phase claim, and we have had no difficulty resolving the latter issue without addressing the former.  Because the district court's grant of an evidentiary hearing on the penalty phase claim is interlocutory in nature and no exception to the final judgment rule applies, we lack jurisdiction to review that decision.

## IV.  CONCLUSION

For the foregoing reasons, we vacate the district court's grant of habeas relief on Reaves' claim that trial counsel was ineffective in failing to pursue a voluntary intoxication defense, and remand for further proceedings on Reaves' outstanding claim of ineffective assistance of counsel during the penalty phase of his retrial.  We do not reach, and do not express any view on, whether the petitioner is entitled to an evidentiary hearing on that claim.

**VACATED AND REMANDED.**