[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12600

_____

D.C. Docket No. 2:13-cv-01142-AKK

DONALD BROADNAX,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 7, 2021)

Before WILSON, MARTIN, and JILL PRYOR, Circuit Judges.

MARTIN, Circuit Judge:

Donald Broadnax, an Alabama death row prisoner, appeals the District

Court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  Mr.

Broadnax raises three issues in this appeal.  First, he says trial counsel was ineffective for failing to investigate his alibi for the time of the crime.  Second, Mr. Broadnax argues that Alabama's application of its hearsay rules to exclude testimony at his state habeas evidentiary hearing violated his due process rights.  Finally, he argues the prosecutor engaged in misconduct by shifting the burden of proof from the state to Mr. Broadnax.  After careful consideration, and with the benefit of oral argument, we affirm the denial of Mr. Broadnax's habeas petition.

## I.  BACKGROUND AND PROCEDURAL HISTORY

A. TRIAL AND OFFENSE CONDUCT

In April 1996, Mr. Broadnax was serving a sentence of 99 years' imprisonment and lived at a prison work release center in Alexander City, Alabama.  Broadnax v. State ("Broadnax I"), 825 So. 2d 134, 150 (Ala. Crim. App. 2000).  He was assigned to work at Wellborn Forest Products, also in Alexander City.[1]  Id.  Wellborn made wooden furniture like cabinets, doors, and other items.  Mr. Broadnax was married to Hector Jan Stamps Broadnax, and Jan would on occasion have dinner with Broadnax while he was on his break at Wellborn.  Id.  One of these occasions was April 25, 1996.  See id.

---

[1] Different courts have used two different spellings of Wellborn—"Welborn" and "Wellborn."  This opinion will use the latter spelling.

At around 6:00 p.m. that day, Jan brought her three-year-old grandson, DeAngelo Stamps, with her to Wellborn to visit Mr. Broadnax and bring him dinner. Id. at 150, 201. A few hours later, around 8:50 p.m., Jan's car was discovered in Birmingham, Alabama. Id. at 150–51. Jan and DeAngelo were found beaten to death in the vehicle's locked trunk. Id. at 151. The evidence shows that Alexander City, where Mr. Broadnax lived and worked, is about an hour and a half drive from Birmingham where Jan and DeAngelo were found.

The next day, Birmingham detectives questioned Mr. Broadnax at the Alexander City work release center. Mr. Broadnax told detectives he last saw Jan and DeAngelo at around 8:20 p.m. the previous night, when they left after bringing him some food. Mr. Broadnax said that after Jan and DeAngelo left, he remained at Wellborn, working and making at least one phone call. He denied going to Birmingham and denied any involvement in the murders. Nevertheless, Mr. Broadnax was arrested for the murders a few days later.

Trial began in June 1997. Mr. Broadnax was represented by William Brower and Darryl Bender, two lawyers appointed to represent him. The state's theory of the case was that Jan did not know Mr. Broadnax was serving a prison sentence for murder until he was turned down for parole. After she learned the truth, the state said, she planned to divorce Mr. Broadnax and stop helping him in

3

his efforts to obtain parole. The state said this was the reason Mr. Broadnax killed her.

The state's evidence was circumstantial, but three witnesses were called to testify about what they saw at Wellborn that night. Johnny Baker, a prisoner at the Alexander City work release center who was Mr. Broadnax's coworker at Wellborn, testified that he saw Broadnax driving Jan's car at Wellborn on the evening of April 25, 1996. Broadnax I, 825 So. 2d at 150. According to Mr. Baker, Mr. Broadnax stopped to talk and Baker saw a child in the backseat. Id. Mr. Baker testified that he was "pretty sure" the child was alive when he spoke with Mr. Broadnax. Id.

Next, the state offered witnesses that tended to show Mr. Broadnax was seen returning to Wellborn within a time window that would have permitted him to drive to Birmingham and back. Mark Chastain, a security guard at Wellborn, and Mark's wife Kathy, testified they saw Mr. Broadnax at Wellborn between 10:30 and 10:45 p.m. that night. Id. Mark was in charge of locking the building and setting the alarm system for the night. After he set the alarm, Mark saw someone run past him in the shop. Mark asked the person who they were, and the person "called back . . . 'It's me, Donald.'" Mark told Mr. Broadnax they needed to hurry and get out before the alarm sounded, so the two men left the building. Once they

4

were outside, Mr. Broadnax asked Mark to call the work release center van for him. Mark couldn't go back into Wellborn to use the phone, so he stopped at a gas station a mile down the road and called the work release center and told them to come get Mr. Broadnax.

Meanwhile, Kathy Chastain had been in the Wellborn parking lot waiting to pick up Mark. As Kathy was waiting, she saw a white truck pull into the parking lot. A man got out and entered Wellborn carrying a small cooler.[2] A few minutes later, Mark came out with the same person Kathy had seen going inside.

The jury also heard testimony about physical evidence from detectives and crime scene analysts. Two pieces of evidence were found at the Alexander City work release center: a work uniform that said "Donald" on the shirt and a pair of Red Wing brand boots. Broadnax I, 825 So. 2d at 151. There was blood on both items. Id. DNA tests performed on the shirt indicated the blood belonged to Jan and DeAngelo. Id. Another piece of evidence was found at Wellborn a few days later. Employees turned in an earring, which was found outside the back door near where employees would take their breaks. Id. The Wellborn earring matched an earring found on the rear floorboard of Jan's car in Birmingham. Id. Finally, a

---

[2] The jury heard testimony that when Jan left her house on April 25, she took plastic containers full of food to bring to Mr. Broadnax. Officers later collected the containers, with the food still inside, from Wellborn.

5

detective testified that Mr. Broadnax had time to travel from Wellborn in Alexander City to where Jan's car was found in Birmingham within the time frame indicated by the state's evidence. Id.

Mr. Broadnax's attorneys did not present any evidence to rebut the state's case. They did, however, emphasize the absence of evidence directly implicating Mr. Broadnax, and cross-examine witnesses to undermine the state's circumstantial evidence. Trial counsel also argued that Mr. Broadnax had an alibi and that he could not have driven from Alexander City to Birmingham and back within the relevant time frame.

On June 6, 1997, after deliberating for less than two hours, the jury returned with its verdict. Mr. Broadnax was convicted of four counts of capital murder for the deaths of Jan and DeAngelo. Broadnax v. State ("Broadnax III"), 130 So. 3d 1232, 1236 (Ala. Ct. Crim. App. 2013). The penalty phase began immediately after the jury's verdict. The state relied on the evidence it presented during the guilt phase. Mr. Broadnax presented only the testimony of his sister, Dorothy McKinstry. Dorothy told the jury about Mr. Broadnax's childhood. Essentially, he "didn't have a childhood."

After deliberating for 24 minutes, the jury unanimously recommended Mr. Broadnax be sentenced to death. Broadnax III, 130 So. 3d at 1236. The trial court

6

followed the jury's recommendation.  Id.  In its sentencing order, the trial court said it found four aggravating circumstances.  The trial court did not find any statutory mitigating circumstances.  Even when taking Dorothy McKinstry's testimony into account, the trial court found "beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and [are] sufficient to uphold the jury's recommendation of punishment at death."  See Broadnax I, 825 So. 2d at 233 (Appendix A, corrected sentencing order).

The Alabama Court of Criminal Appeals ("CCA") ultimately affirmed Mr. Broadnax's convictions and sentence.  See Broadnax I, 825 So. 2d at 222 (affirming conviction); see id. at 226 (affirming sentence following remand).  The Alabama Supreme Court granted certiorari and affirmed the CCA's decision.  Ex parte Broadnax, 825 So. 2d 233, 235, 237 (Ala. 2001).  The United States Supreme Court denied certiorari.  Broadnax v. Alabama, 536 U.S. 964, 122 S. Ct. 2675 (2002) (Mem.).

B.  STATE POSTCONVICTION

On June 25, 2003, Mr. Broadnax timely filed a state postconviction motion under Alabama Rule of Criminal Procedure 32, which challenged his convictions and sentence.  Broadnax III, 130 So. 3d at 1239.  The first of two evidentiary

7

hearings was held on May 23, 2005.  Id. at 1240.  Mr. Broadnax presented

testimony from eight witnesses.  Relevant to his claims in this appeal, Mr. Bender

and Mr. Brower, Mr. Broadnax's trial counsel, testified about their work on

Broadnax's case.

The Rule 32 court found that the performance of Mr. Broadnax's trial

counsel was not deficient.  The court also found Mr. Broadnax could not show

prejudice.  On June 14, 2005, the Rule 32 court issued a final order denying Mr.

Broadnax's Rule 32 petition.

Mr. Broadnax appealed this decision to the CCA, which reversed the Rule

32 court, saying that the court made a procedural error.  The CCA remanded Mr.

Broadnax's case for further proceedings.  Broadnax III, 130 So. 3d at 1240; see

Broadnax v. State ("Broadnax II"), 987 So. 2d 631, 642 (Ala. Ct. Crim. App.

2007).  Back before the Rule 32 court, Mr. Broadnax filed an amended petition

asserting additional claims.  The Rule 32 court ordered a second evidentiary

hearing limited to issues of ineffective assistance of counsel in the guilt and

penalty phases of trial.  The second hearing was held on March 14 and 15, 2011.

Mr. Broadnax presented the testimony of an additional eight witnesses.  In

pertinent part, Mr. Broadnax raised a new guilt-phase theory, arguing that trial

counsel were ineffective for failing to investigate his alibi.  He claimed he was at

8

the work release center in Alexander City between 9:00 and 10:00 p.m. on the night of the murders and therefore could not have possibly been in Birmingham around 8:50 p.m. to abandon the car containing Jan's and DeAngelo's bodies. In support of this theory, Mr. Broadnax presented witnesses who said they saw him at the work release center and offered a document that prisoners used to log the time they left the center and the time they returned. The prisoner sign-in log indicated that Mr. Broadnax left the work release center at 5:30 a.m. for the "c. shop," or cabinet shop (meaning Wellborn), and returned at 9:00 p.m. Mr. Broadnax also offered evidence to show counsel did not properly investigate mitigating evidence for sentencing. This evidence included, among other things, testimony from Dr. Kenneth Benedict, an expert in psychology, about intellectual disability tests he administered to Mr. Broadnax.

The state introduced two exhibits to rebut Mr. Broadnax's alibi evidence. First, the state offered Mr. Broadnax's original statement he gave to police the day after the murders. In this statement, he told police he stayed at Wellborn after his shift because Jan was bringing him food. He tried calling Jan around 10:30 p.m. to make sure she got home safe when a man named Mark turned off the lights and told Mr. Broadnax they had to hurry and get out of the building because the alarm was set. The second exhibit was the Alexander City work release center log of

9

prisoners' comings and goings. This log was kept by the officers and indicated Mr. Broadnax returned to the work release center at 11:50 p.m.

On May 6, 2011, the Rule 32 court issued its final order denying relief on Mr. Broadnax's petition. He appealed and the CCA affirmed the denial of relief on February 15, 2013. Broadnax III, 130 So. 3d at 1268.

## C. FEDERAL HABEAS

Mr. Broadnax filed his federal habeas petition on June 17, 2013. Relevant to this appeal, he raised three claims. First, Mr. Broadnax raised a guilt-phase ineffective assistance claim. He said that trial counsel did not conduct a reasonable investigation related to the guilt phase because counsel did not speak with anyone at the Alexander City work release center. He said the CCA placed an improper burden of proof on him by imposing "an outcome-determinative burden . . . to establish his innocence" to meet the prejudice requirement under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Second, he said Alabama's evidentiary rule prohibiting hearsay evidence during Rule 32 hearings— specifically, in relation to the background information Dr. Benedict would have discussed—violated his due process rights. Finally, Mr. Broadnax argued that the state shifted the burden of proof from it to him by asking whether he presented any evidence or explanation of what happened.

10

The District Court denied the federal petition, and denied Mr. Broadnax's

Rule 59 motion to reconsider the final judgment.  Mr. Broadnax timely appealed.

## II.  STANDARD OF REVIEW

We review de novo a district court's denial of a habeas corpus petition.

Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010).  A petitioner is entitled to

habeas relief only if his claim is meritorious and the state court's resolution of that

claim was contrary to, or an unreasonable application of, clearly established

Supreme Court precedent, or was based on an unreasonable determination of the

facts presented in the state court proceeding.  28 U.S.C. § 2254(d).

## III.  DISCUSSION

A. THE CCA'S DENIAL OF MR. BROADNAX'S GUILT-PHASE
   INEFFECTIVE ASSISTANCE CLAIM WAS NOT AN UNREASONABLE
   DETERMINATION OF THE FACTS OR CONTRARY TO CLEARLY
   ESTABLISHED LAW

The CCA upheld the Rule 32 court's three findings resulting in the denial of

this ineffective assistance claim.  Broadnax III, 130 So. 3d at 1255–60.  First, the

CCA agreed with the Rule 32 court that because Mr. Broadnax failed to call either

Mr. Brower or Mr. Bender to testify at the second evidentiary hearing, the record

was silent as to trial counsel's reasons for their alleged failure to investigate and

present evidence showing Broadnax was at the work release center at 9:00 p.m.  Id.

at 1255–56.  Second, the CCA upheld the Rule 32 court's finding that Mr.

11

Broadnax failed to prove counsel's performance was deficient, because neither Mr. Brower nor Mr. Bender "had any reason whatsoever to think that an investigation into the possibility that Broadnax was somewhere other than Welborn at 9:00 p.m." was necessary, based on Broadnax's statements that he was at Wellborn until around 10:45 p.m. Id. at 1256–58. Finally, the CCA agreed that the testimony at the second evidentiary hearing "failed to prove that [Broadnax] was at the work-release facility at 9:00 p.m.," such that Mr. Broadnax failed to prove he was prejudiced by counsel's conduct. Id. at 1258–60.

Mr. Broadnax argues that the CCA's decisions were objectively unreasonable. First, he claims the CCA misapplied Strickland because Strickland does not limit proof of counsel's deficient performance to counsel's own testimony. Second, he says the CCA's ruling that counsel properly limited the scope of their investigation based on his statements misapplies Strickland, because that precedent "requires that counsel undertake reasonable investigations." Finally, Mr. Broadnax argues that the CCA improperly discounted the evidence he provided to support his alibi.

1.    Legal Standard

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that his counsel's performance was deficient and that counsel's

12

deficient performance prejudiced him.  See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  A petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689, 104 S. Ct. at 2065 (quotation marks omitted).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–91, 104 S. Ct. at 2066.

To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.  The inquiry into prejudice at the guilt phase still "requires us to evaluate the totality of the evidence—both that adduced at trial, and the evidence adduced in the habeas proceedings." Reaves v. Sec'y, Fla. Dep't of Corr., 717 F.3d 886, 901 (11th Cir. 2013) (quotation marks omitted) (analyzing guilt-phase ineffective assistance claim).

13

2.    Trial Counsel's Performance

Mr. Broadnax first argues the CCA unreasonably applied Strickland by presuming counsel was competent "absent more specific questioning about why counsel had not offered evidence to support a particular alibi."  Although this argument seems persuasive at first glance, it ultimately fails because Mr. Broadnax has offered no evidence to show counsel should have investigated an alibi that contradicted the alibi Broadnax told the police and counsel in the beginning.

On this record, we cannot conclude the CCA unreasonably applied Strickland by finding counsel's performance was not deficient.  However, it is first worth noting the CCA improperly emphasized the fact that trial counsel "were never specifically questioned" about their failure to investigate an alibi defense.  See Broadnax III, 130 So. 3d at 1255–56.  Mr. Broadnax did not raise the claim that trial counsel were ineffective for failing to investigate an alibi until he filed his second amended Rule 32 petition.  Id. at 1255.  And he made this filing only after the first evidentiary hearing when Mr. Brower and Mr. Bender testified.  See id.  Because the lawyers were not called as witnesses at the second evidentiary hearing, they were never asked about their investigation into this alibi.  Nevertheless, the record is not completely silent about their investigation, and counsel's lack of investigation is troubling.  For example, counsel filed no motions, including the

14

motion for funds to hire an investigator, until May 9, 1997.  The court granted the motion for funds on May 14.  This was mere weeks before voir dire began on June 2.  Beyond that, counsel did not appear to investigate Mr. Broadnax's statement that he was speaking with someone on the phone at Wellborn around 9:00 p.m., because the state surprised defense counsel with phone records (which showed no call was placed) on the last day of trial.[3]  Troubling though this lack of investigation may be, Mr. Broadnax does not make these arguments here in this appeal because they do not further the alibi he asserted before the Rule 32 court.

In relation to the specific alibi claim before us, this record does not support the conclusion that the CCA unreasonably determined "the record is ambiguous" and presumed counsel exercised reasonable professional judgment.  See Broadnax III, 130 So. 3d at 1256.  Even though counsel did not officially retain an investigator until mere weeks before trial, Mr. Bender testified that the investigator probably began to work on Mr. Broadnax's case before the motion for funds to hire an investigator was granted.  Mr. Brower testified that the investigator "started fairly quickly after the preliminary hearing," and the reason they waited to file pretrial motions until May was "[b]ecause that's when the judge asked us to file

---

[3] Trial counsel objected at trial on the grounds that they did not receive the phone records until the week of trial at the earliest, and the morning of the day before the verdict, at the latest.

15

them."  The record also indicates that counsel instructed the investigator "to talk to people in the Elyton Village area who may have seen any part of the crime, . . . and to talk to people at the work release center" or at Wellborn.  This record is silent as to any failure on the investigator's part, and the only evidence appears to show there simply was no exculpatory evidence to discover.  Mr. Bender said the investigation was "[n]ot a whole lot" of assistance "because there was just so little to what we could find relative to this particular crime.  It happened in a confined setting.  And so the people involved were, the number was restricted."  Based on these facts, we cannot conclude counsel's investigation was unreasonable.  Thus, the CCA reasonably presumed counsel's performance was not deficient.  See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (explaining that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

Second, the CCA did not make an unreasonable determination of the facts when it found Mr. Broadnax failed to prove counsel's alibi investigation was deficient.  See Broadnax III, 130 So. 3d at 1256–58.  The CCA upheld the Rule 32 court's findings that Mr. Broadnax's new alibi was inconsistent with the alibi he offered at trial, so counsel merely performed a reasonable investigation based on the information Broadnax supplied.  See id. at 1249, 1256–57.  At trial, the defense

16

theory was that Mr. Broadnax was present at Wellborn the whole night. The defense theory now proffered is that Mr. Broadnax was back at the work release center around 9:00 p.m. See id. at 1258. The CCA said that based on Mr. Broadnax's statements to police and to counsel, "neither Brower nor Bender had any reason whatsoever to think that an investigation into the possibility that Broadnax was somewhere other than Welborn at 9:00 p.m. the night of the murders was necessary." Id. This seems right to us.

The information provided by a defendant with regard to any possible defenses is relevant to the scope of counsel's investigation. Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252, 1269–70 (11th Cir. 2012) (citing Strickland, 466 U.S. at 691, 104 S. Ct. at 2066). Because Broadnax did "not mention" he was at the work release center at the time of the murders, his "lawyer[s] [were] not ineffective for failing to discover or to offer [such] evidence." Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) (quotation marks omitted); see also Callahan v. Campbell, 427 F.3d 897, 934–35 (11th Cir. 2005) (holding counsel's investigation was reasonable when defendant did not tell counsel he was abused and there was no documentation of abuse in records counsel obtained). And, to the extent Mr. Broadnax argues that a reasonable investigation required counsel to at

17

least interview people at the work release center or seek records there, Broadnax cannot show prejudice, as described below.

### 3.    Prejudice

Mr. Broadnax argues that the CCA's finding that he "failed to prove" he was actually at the work release center at 9:00 p.m. is objectively unreasonable because (1) that finding fixated on 9:00 p.m. to the exclusion of other relevant evidence; (2) factual inconsistencies in the trial and postconviction evidence do not foreclose the existence of reasonable doubt; and (3) the Rule 32 court made "wholly speculative and adverse credibility assessments" about whether jurors would have believed Broadnax's exculpatory evidence.

Mr. Broadnax's first argument fails. The only "relevant alibi evidence" he specifically points to as being excluded is the affidavit of Phillip Holsemback, who was also incarcerated at the Alexander City work release center. Mr. Holsemback did say he saw Mr. Broadnax in the sergeant's office before 10:00 p.m. on April 25, 1996. But most of the affidavits Mr. Broadnax offered, including Mr. Holsemback's affidavit, were only proffered to the Rule 32 court and never entered into evidence. Mr. Broadnax did not challenge this evidentiary ruling on appeal to the CCA. See Broadnax III, 130 So. 3d at 1250 n.15. Neither has he argued—before us or the District Court—that the state courts erred by not considering the

18

affidavits on appeal.  We simply cannot consider the affidavits for the first time now.

Mr. Broadnax also takes issue with the CCA's finding that the prisoner sign-in log, which indicates Broadnax signed into the work release center at 9:00 p.m., could have been altered.  He says this finding "pretermitted consideration of several material facts" in witnesses' testimony.  But this argument fails because the function of a trial court is to weigh inconsistencies in the evidence.  And this is what the Rule 32 court (as affirmed by the CCA) did.  Broadnax III, 130 So. 3d at 1258–59.  The CCA held that none of the witness testimony "indicated that anyone saw Broadnax at the work-release facility at 9:00 p.m." Id. at 1259.

This finding is not unreasonable.  Marcus Whetstone, an officer, testified he remembered seeing Mr. Broadnax on April 25, 1996, sometime before he conducted the last head count, which was around 11:00 p.m. or midnight.  James Smith, a prisoner, remembers seeing Mr. Broadnax around 11:00 p.m. in the sergeant's office as the sergeant told him the news about Jan.  Floyd Cumbie, an officer, did not see Mr. Broadnax but remembered the head count conducted around 9:00 p.m. cleared and no prisoners were missing.  Yet Mr. Cumbie also admitted that if Mr. Broadnax requested to work late (as he claimed before the Rule 32 court), it was possible Broadnax would not have been deemed missing at

19

the 9:00 p.m. head count.  Mr. Broadnax points to Donald Bowden's testimony—that Mr. Bowden picked Broadnax up at Wellborn between 9:00 and 10:00 p.m.—as hard evidence contradicting the state's trial theory.  But the CCA upheld the Rule 32 court's finding that Mr. Bowden's testimony conflicted with the work release log, which showed Bowden made only one trip at 9:00 p.m., and Mr. Broadnax was not listed on the work release log as being present on that trip.  Broadnax III, 130 So. 3d at 1258–59.  Rather, the log shows Mr. Bowden left with three prisoners at 9:00 p.m. (and presumably dropped them somewhere), picked up Roger Stolz and an R. Williams, and returned with Stolz and Williams at 10:45 p.m.  The log also shows Mr. Bowden going out "to C. shop" at 11:12 and returning with Mr. Broadnax and another prisoner at 11:50 p.m.

Based on this evidence, the CCA held that Mr. Broadnax failed to prove that he was "at the work-release center 'at a time which would have made it impossible for him to have committed a murder in Birmingham' as he alleges."  Broadnax III, 130 So. 3d at 1260.  This also shows that although the CCA looked at the 9:00 p.m. mark based on Mr. Broadnax's Rule 32 theory, it did not "fixate" on that time to the exclusion of other evidence.  We therefore cannot disagree with the CCA's decision to uphold the Rule 32 court's resolution of conflicting testimony and evidence.  See Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1292 (11th Cir.

20

2016) (holding that when a state court is "presented with squarely conflicting testimony on [a] critical factual dispute," we are "powerless to revisit [the state court's determination] on federal habeas review" absent "clear and convincing evidence in the record to rebut this credibility judgment").

Second, Mr. Broadnax says that factual inconsistencies in the trial and postconviction evidence do not foreclose the existence of reasonable doubt. But, as explained above, we are bound by the Rule 32 court's findings after it weighed the evidence. Neither did the CCA obviously misstate the prejudice standard. It looked at whether the Rule 32 evidence refuted or contradicted the state's theory that Mr. Broadnax could make it to Birmingham and back within the timeframe reflected by the evidence, such that the jury would have a reasonable doubt respecting guilt. See Broadnax III, 130 So. 3d at 1260 (holding that because Mr. Broadnax failed to prove he was at the work release center at 9:00 p.m., he failed to show it was "impossible for him to have committed a murder in Birmingham").

Mr. Broadnax's third argument, that the Rule 32 court made "wholly speculative and adverse credibility assessments" about whether jurors would have believed Broadnax's exculpatory evidence, fares no better. Mr. Broadnax points to the CCA's decision to uphold the findings that (1) Mr. Bowden was not credible; and (2) the "infer[ence]" that "the jury surely would have" reached based on the

21

inconsistencies between the work release and prisoner sign-in logs is that "when Broadnax returned to the center at 11:50 p.m. he simply wrote down '9:00.'" Broadnax III, 130 So. 3d at 1259.  But again, we must defer to the Rule 32 court's credibility determinations unless they are clearly erroneous.  See Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) (per curiam) ("Determining the credibility of witnesses is the province and function of the state [postconviction] courts . . . .");  see Landers v. Warden, 776 F.3d 1288, 1294 (11th Cir. 2015).  Mr. Broadnax has not argued that those findings are unreasonable determinations of the facts, and we see no basis in this Circuit's precedent to conclude that the CCA's decision is contrary to clearly established law.  In sum, Mr. Broadnax has not established prejudice.

*       *       *

Because Mr. Broadnax has failed to show the CCA's denial of his guilt-phase ineffective assistance claim was based on an unreasonable determination of the facts, or was contrary to, or an unreasonable application of, clearly established federal law, we must affirm the District Court's denial of this claim.

B.  FEDERAL LAW DOES NOT CLEARLY ESTABLISH THAT ALABAMA'S HEARSAY RULES CREATE A DUE PROCESS VIOLATION

Mr. Broadnax also argues the CCA unreasonably rejected his argument that the Rule 32 court violated his due process rights when, citing hearsay grounds, it

22

prohibited Dr. Benedict from testifying about statements from Broadnax and Broadnax's family. At the second evidentiary hearing before the Rule 32 court, Mr. Broadnax called Dr. Benedict as an expert witness to testify about intellectual disability tests Benedict administered to Broadnax.

Before Dr. Benedict was asked about Mr. Broadnax's test results, the state moved to prevent Benedict from testifying to hearsay evidence under Waldrop v. State, 987 So. 2d 1186 (Ala. Crim. App. 2007). In Waldrop, the CCA confirmed that because the Alabama Rules of Evidence apply to Rule 32 proceedings, hearsay testimony must be excluded even though it would have been admissible if offered during the penalty phase of trial. Id. at 1190; see also Whatley v. State, 146 So. 3d 437, 486 (Ala. Ct. Crim. App. 2010) ("The Rules of Evidence to not apply to sentencing hearings." (citing Ala. R. Evid. 1101(b)(3)). The state said that because information Dr. Benedict gained from speaking with Mr. Broadnax and his family members is not subject to cross-examination, Broadnax could not "back door hearsay in through this psychologist."

Ultimately, the court agreed that although Dr. Benedict could have testified about what he learned at sentencing, Rule 32 evidentiary rules prohibited any information Benedict learned from Mr. Broadnax's family members, because that was hearsay testimony. Postconviction counsel thus proffered what Dr. Benedict

23

learned about Mr. Broadnax's history,[4] but the Rule 32 court considered the proffered evidence only to find that Broadnax could not show prejudice on an alternative ground.[5]

In this appeal, Mr. Broadnax argues that both the CCA and the District Court misapplied Sears v. Upton, 561 U.S. 945, 130 S. Ct. 3259 (2010) (per curiam), and Green v. Georgia, 442 U.S. 95, 99 S. Ct. 2150 (1979) (per curiam), which he says require reliable hearsay evidence to be introduced where there are "substantial reasons" to assume its reliability.

In Green, the defendant appealed his capital sentence for murder. 442 U.S. at 95–96, 99 S. Ct. at 2151. Mr. Green was indicted with Carzell Moore. Id. The evidence at trial showed that Mr. Moore and Mr. Green, "acting either in concert or separately," raped and murdered the victim. Id. at 96, 99 S. Ct. at 2151. At the

---

[4] Counsel proffered the following facts: Mr. Broadnax's mother was fourteen when she married her first husband; his mother suffered from social phobia and rarely left the house; his father was emotionally and physically absent during Broadnax's childhood and had a gambling addiction; his sister struggled with "disabling anxiety" like Broadnax; he was raped at age 12; at 13, he was hit by a car and pinned between the car and a brick wall; he witnessed the shooting and killing of a good friend; he was beaten by his mother; he started drinking alcohol and "made a serious attempt on his life by taking [his sister Dorothy's] pain medication"; he faced bullying, ridicule, and knife attacks from gang members (which counsel believed led to Broadnax's first murder conviction); his father suffered a stroke and Broadnax became his father's primary caretaker until he died when Broadnax was 16; and when incarcerated for murder at 17, he fended off several sexual assaults.

[5] The Rule 32 court found that "it is not reasonably probable" that Dr. Benedict's diagnosis of post-traumatic stress disorder based on Mr. Broadnax's childhood sexual assault, which "occurred more than twenty years earlier," would have had any impact whatsoever on the jury's decision to sentence Broadnax to death.

24

penalty phase of trial, Mr. Green tried to introduce the testimony of Thomas Pasby, who would have testified that Mr. Moore told Pasby he killed the victim after ordering Green to run an errand. Id. The trial court refused to allow Mr. Pasby to testify, citing Georgia's hearsay rules. Id. The Supreme Court reversed and vacated Mr. Green's sentence, holding that under these facts, the exclusion of Mr. Pasby's testimony constituted a due process violation. Id. at 97, 99 S. Ct. at 2151. It cited two considerations: (1) "[t]he excluded testimony was highly relevant to a critical issue" in the penalty phase, and (2) there were several reasons to assume the statement was reliable. Id. Therefore, in those "unique circumstances, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id. at 97, 99 S. Ct. at 2151–52 (quotation marks omitted).

In Sears, the petitioner appealed Georgia's denial of postconviction relief. 561 U.S. at 946, 130 S. Ct. at 3261. Mr. Sears claimed trial counsel was ineffective for failing to present mitigating evidence. Id. at 947–48, 130 S. Ct. at 3261–62. That evidence would have shown that Mr. Sears had an abusive home life, was sexually abused, suffered from substantial deficits in cognition, and that Sears's brother introduced him to a life of crime. Id. at 948–50, 130 S. Ct. at 3262–63. In holding that the state court misapplied Strickland's prejudice prong, the Supreme Court mentioned that "the fact that some of [the mitigating] evidence

25

may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." Id. at 950, 130 S. Ct. at 3263. In a footnote, the court cited Green for the principle that reliable, relevant hearsay evidence "should not be excluded by rote application of a state hearsay rule." Id. at 950 n.6, 130 S. Ct. at 3263 n.6.

First, assuming that Green and Sears do stand for the premise that mitigating hearsay evidence is always admissible at the postconviction stage, Mr. Broadnax has not persuaded us that the testimony from Dr. Benedict would have met Green's reliability prong. Mr. Broadnax says the interviews "were corroborated by testing" and, vice-versa, that the interviews corroborated the results of the psychological tests. But corroboration was just one of several reasons the Green court held that Mr. Pasby's testimony was reliable. See id. at 97, 99 S. Ct. at 2151. Unlike in Green, Mr. Broadnax relies only on the mutual corroboration of the interviews and testing, and no other reliability considerations. Further, the type of corroboration Mr. Broadnax offers is different than what was present in Green. Mr. Broadnax's postconviction counsel did not introduce evidence at the Rule 32 hearing to corroborate each piece of evidence proffered to the Rule 32 judge. See Chambers v. Mississippi, 410 U.S. 284, 300–01, 93 S. Ct. 1038, 1048 (1973) (holding that each hearsay statement "was corroborated by some other evidence in the case").

26

Thus the CCA's decision was not contrary to clearly established Supreme Court precedent.  Cf. Randolph v. McNeil, 590 F.3d 1273, 1277 (11th Cir. 2009) (per curiam) (holding that petitioner could not overcome AEDPA deference to show a due process violation).

And, although questions of admissibility under Alabama's hearsay rule, regarding exclusion or admission, are subject to constitutional requirements (including due process), see Ala. R. Evid. 802 advisory committee's note, there is no precedent that clearly establishes  Mr. Broadnax was deprived of a fair postconviction proceeding.  That is because Mr. Broadnax was not prevented from calling other witnesses to testify firsthand about the information Dr. Benedict learned.  Cf. Chambers, 410 U.S. at 298–303, 93 S. Ct. at 1047–50 (holding that petitioner was denied a fair trial when the court refused to allow him to introduce hearsay testimony and refused to permit him to call other witnesses); see also Broadnax III, 130 So. 3d at 1245 ("[N]othing prevented Broadnax from calling his family members to testify or from testifying himself regarding the same information that had allegedly been provided to Dr. Benedict." (footnote omitted)).  Postconviction counsel, for whatever reason, chose not to call the corroborating witnesses.  The CCA did not unreasonably determine Mr. Broadnax was not denied due process.  See Broadnax III, 130 So. 3d at 1245–46.

27

C. THE CCA'S DETERMINATION THAT THE PROSECUTOR DID NOT
SHIFT THE BURDEN OF PROOF TO MR. BROADNAX WAS NEITHER
UNREASONABLE NOR CONTRARY TO CLEARLY ESTABLISHED LAW

In a criminal proceeding, the government has the burden of proving every

element of the charged offense beyond a reasonable doubt.  United States v. Nerey,

877 F.3d 956, 970 (11th Cir. 2017).  As a result, "prosecutors must refrain from

making arguments that improperly shift the burden of proof to the defendant."  Id.

Mr. Broadnax says that during closing arguments, the prosecutor told the jurors

they should consider whether Broadnax's counsel is giving them "another

reasonable explanation" for Jan's and DeAngelo's murders.  The prosecutor said,

in full, that Mr. Broadnax had two fine attorneys and:

> [W]hat I want you to be thinking the whole time they're
> up here is: Are they giving me another reasonable
> explanation for all of this?  Are they explaining this in a
> reasonable way?  Does it make sense, or is it like that little
> boy with the cookie stains on his mouth saying that
> Martians beamed into the kitchen and took that bite out of
> the cookie?  . . .  Look at whether they provide you with a
> reasonable explanation.

Mr. Broadnax argues that these statements shifted the burden of proof to him, and

that the CCA's and the District Court's rejection of this claim is contrary to the

28

Supreme Court's decision in Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450 (1979).[6]

Because the CCA rejected this claim on direct appeal, we look to Broadnax I as "the last reasoned decision of the state courts" on this claim. See Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1203 (11th Cir. 2013). The CCA held that the prosecutor's argument did "no[t] suggest[] . . . that Broadnax had an obligation to produce any evidence or to prove his innocence"; rather, the prosecutor "merely asked the jury to consider the evidence presented" and determine whether there was a reasonable doubt as to Broadnax's guilt. Broadnax I, 825 So. 2d at 185. The CCA also said no reasonable juror would have construed the prosecutor's comments to mean Mr. Broadnax had any burden of proof because the trial court instructed the jury regarding the state's burden of proof and Broadnax's presumption of innocence. Id. The District Court agreed, finding that "the prosecutor directed his statement at defense counsel and their offered explanations for the circumstantial evidence." The court also agreed with the CCA

---

[6] Sandstrom held that a jury instruction—"the law presumes that a person intends the ordinary consequences of his voluntary acts"—shifted the burden of proof to the defendant because the jury could have interpreted the "presum[ption]" as requiring the defendant offer some proof of a lack of intent. 442 U.S. at 513, 517, 99 S. Ct. at 2453, 2456 (alteration adopted). Mr. Broadnax places great weight on Sandstrom, but because he is not arguing about the instructions given to the jury, we rely on more factually similar cases.

29

that any possible prejudice to Mr. Broadnax was cured by the jury instructions regarding the burden of proof.

"Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights." United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998) (quotation marks omitted). The first element is determined by looking to four factors: "(1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." Nerey, 877 F.3d at 970 (quotation marks omitted). The second element, prejudice, is shown "when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Merrill, 513 F.3d 1293, 1307 (11th Cir. 2008) (quotation marks omitted). Where there is "sufficient independent evidence of guilt," a defendant cannot show he was prejudiced by any misconduct by the prosecutor. See id. (quotation marks omitted).

In reviewing the prosecutor's comment in context, we cannot say the CCA's finding was unreasonable. Though "perhaps improper," the prosecutor's closing argument comments did not shift the burden of proof to Mr. Broadnax. Nerey, 877

30

F.3d at 971.  Rather, the prosecutor's comments "appeared to concern the failure of the defense to counter the evidence presented by the government," not Mr. Broadnax's failure to show evidence of his innocence.  See United States v. Watson, 866 F.2d 381, 386 (11th Cir. 1989) (finding proper prosecutor's comment in response to defense counsel's argument that the government failed to disprove alternative explanations).  When "the prosecutor merely emphasize[s] the defense's failure to produce" evidence to rebut the government's argument, "such an argument [is] permissible."  Hernandez, 145 F.3d at 1439 (emphasis omitted).

That is what happened here.  During voir dire, the prosecutor asked potential jurors whether they would have an issue with convicting a defendant based only on circumstantial evidence.  The prosecutor explained circumstantial evidence by telling the jury to picture a snowy front yard:

> And when you went to bed that Friday night and you looked out and you saw the snow falling, you saw a fresh coat [of] undisturbed . . . white snow on your yard.  You got up early the next morning and you saw some dog prints through the snow.  Now, you did not see that dog walking across your yard in the snow, but from the prints left behind you could reasonably conclude that a dog had crossed your yard and left those prints there in the snow.  That, ladies and gentlemen, is circumstantial evidence.

Trial counsel for Mr. Broadnax referenced this instruction in his opening statement, and said "those tracks don't tell you which dog went across there.  It

31

might tell you if it was a big dog or a little dog, but it's not going to tell you whether it was a hound dog or a hunting dog or a poodle.  That's for y'all to determine."  Counsel also told the jurors he would "question the evidence" and try to show them "that it means something besides what the State says it does."  These remarks by the defense were the lead-in to the prosecutor's closing argument comment about what other "reasonable explanation" there could possibly be for the evidence at trial.

And even though this case was based on circumstantial evidence, the evidence tended to show that Mr. Broadnax was the only person who knew Jan and DeAngelo, was seen with Jan and DeAngelo around 8:00 p.m., and who returned around 10:45 p.m. in a vehicle driven by an unidentified person.  Thus there was other evidence that tended to show Mr. Broadnax's guilt, which weighs against a showing of both prosecutorial misconduct elements.  See Nerey, 877 F.3d at 970; Merrill, 513 F.3d at 1307.

In sum, the CCA's finding that the prosecutor did not shift the burden of proof to Mr. Broadnax was neither unreasonable nor contrary to clearly established Supreme Court precedent.

32

## IV.  CONCLUSION

We affirm the District Court's denial of Mr. Broadnax's federal habeas petition.  The Rule 32 court's determinations that Mr. Broadnax's trial counsel's performance was not deficient, and that Broadnax could not show prejudice, were not unreasonable.  Neither can we hold that Alabama's application of its hearsay rules to exclude testimony at his state habeas evidentiary hearing violated his due process rights under clearly established federal law.  Finally, the CCA's finding that the prosecutor did not improperly shift the burden of proof to Mr. Broadnax was not unreasonable, nor was it contrary to clearly established federal law.

**AFFIRMED.**

33

MARTIN, Circuit Judge, joined by JILL PRYOR, Circuit Judge, concurring:

Donald Broadnax is an Alabama prisoner sentenced to die for his crimes. Throughout his state habeas proceedings, Mr. Broadnax's attempt to prove the ineffectiveness of his trial counsel was met with notable resistance. Relying on Alabama's evidentiary rules, the Rule 32 court prevented Mr. Broadnax's expert from testifying about background information the expert relied on in reaching his opinion. The Rule 32 court also repeatedly discounted and dismissed witnesses' testimony offered to show that there were mitigating circumstances in Mr. Broadnax's life that the jury should have heard at sentencing. I write separately about these two details, because they may have determined the outcome of Mr. Broadnax's claim.

## I.

I first write to observe how a seemingly small difference in the Alabama Rule of Evidence may have had a monumental impact on Mr. Broadnax's chances for postconviction relief.

In 2010, Alabama's rule did not allow an expert to base an opinion on testimony that was inadmissible. Under that version of Alabama Rule of Evidence 703 in effect from 1996 to September 30, 2013, an expert could base his opinion only on "[t]he facts or data in the particular case" that are "perceived by or made

34

known to the expert at or before the hearing." Ala. R. Evid. 703 (1996); see also

Craft v. State, 90 So. 3d 197, 217 n.3 (Ala. Crim. App. 2011) (quoting 1996 rule).

Thus, under the old rule, an expert generally could not consider inadmissible

hearsay in reaching his opinion. See Ala. R. Evid. 703 (1996) advisory

committee's note.

However, the current version of Alabama's Rule 703 adds a second and third

sentence that brings it into line with Federal Rule of Evidence 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Ala. R. Evid. 703 & advisory committee's note to 2013 amendment. That means,

if Mr. Broadnax brought his Rule 32 petition today, Dr. Benedict would be

permitted to testify about the background evidence the Rule 32 court excluded in

2011. See Knight through Kerr v. Miami-Dade Cnty., 856 F.3d 795, 809 (11th Cir.

2017) (applying Federal Rule of Evidence 703 to hold that "as we have long

35

recognized, an expert may rely on hearsay evidence as part of the foundation for his opinion so long as the hearsay evidence is the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject" (quotation marks omitted)).

For the reasons set out in the main opinion, the standards of review imposed by the Anti-Terrorism and Effective Death Penalty Act of 1996 allow no relief to Mr. Broadnax for the exclusion of Dr. Benedict's testimony that relied partly on hearsay. Still, it strikes me as wrong to deprive mental health experts, retained by habeas petitioners under a sentence of death, of any ability to rely on family interviews. After all, expert witnesses routinely rely on hearsay in every other context I am aware of. See, e.g., Raulerson v. Warden, 928 F.3d 987, 992–93, 997–98 (11th Cir. 2019) (upholding Georgia state court's denial of ineffective assistance claim where trial counsel retained five mental health experts who opined, based in part on family interviews, that Raulerson was intellectually disabled).

At the oral argument of this case, I was able to ask Alabama's counsel whether, if Mr. Broadnax's case were before the Rule 32 court today, and assuming there is no reason to think the reports from Broadnax's family were unreliable, Dr. Benedict could have testified about what he learned from those

36

family members. I believe the obvious answer to this question is "yes," but Alabama's counsel did not seem to agree. See Oral Argument at 38:34–40:30 (State: "A psychiatrist might rely on that [the fact that a child was raped], but that doesn't necessarily mean that a court should allow that fact to come in in a manner that's untested."); see also id. at 50:59–51:59 (acknowledging that today, the state's motion in limine may "potentially" be denied). But certainly, the hearsay evidence Dr. Benedict relied on is the "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Ala. R. Evid. 703. That means Dr. Benedict would have been permitted to describe the evidence he gained from the family interviews he conducted. This record reflects that Dr. Benedict relied on significant historical and psychosocial factors to conclude that, in addition to a cognitive disorder, not otherwise specified, Mr. Broadnax suffered from panic disorder with agoraphobia and posttraumatic stress disorder. And we know that historical and psychosocial factors are of the type of evidence reasonably relied on by psychologists in forming their opinions. Cf. Rompilla v. Beard, 545 U.S. 374, 392, 125 S. Ct. 2456, 2469 (2005) (explaining that postconviction experts, "alerted by information from school, medical, and prison records . . . , found plenty of 'red flags' pointing up a need to test further," which led them to opine on Rompilla's impairments).

37

With regard to showing prejudice,[1] evidence of a defendant's difficult childhood, poverty, mental problems, and other similar background evidence is sufficient to establish prejudice if that evidence "might well have influenced the jury's appraisal of his moral culpability." Williams v. Taylor, 529 U.S. 362, 398, 120 S. Ct. 1495, 1515 (2000). If the CCA had been allowed to consider the evidence we now know to exist as to Mr. Broadnax's penalty-phase ineffective assistance claim, that Court may well have found that the Rule 32 court unreasonably discounted the evidence of the abuse Broadnax suffered. See Broadnax v. State, 130 So. 3d 1232, 1261 (Ala. Ct. Crim. App. 2013) (declining to consider Dr. Benedict's inadmissible hearsay evidence proffered at the Rule 32 hearing). I certainly would have.

Notably, the Rule 32 court made the alternative finding that Dr. Benedict's diagnosis of PTSD based on Mr. Broadnax's childhood sexual assault would have had zero impact on the jury's decision to sentence Broadnax to death, because it "occurred more than twenty years earlier." This is plainly contrary to Supreme Court precedent. See Porter v. McCollum, 558 U.S. 30, 43, 130 S. Ct. 447, 455 (2009) (per curiam) (holding that it "is unreasonable to discount to irrelevance the

---

[1] Here, I do not address Mr. Broadnax's showing of deficient performance.

38

evidence of [a petitioner's] abusive childhood, especially when that kind of history may have particular salience for a jury" evaluating the petitioner's interpersonal relationships).

Thus, if Mr. Broadnax had appealed his penalty-phase ineffective assistance claim, and if we were able to look at the evidence Dr. Benedict relied on, I believe a de novo review would have been proper. The jury had no knowledge of all the mitigating evidence now in the record. Had the jury heard the background evidence Dr. Benedict relied on, it seems to me there is a reasonable probability that the result of the penalty phase of Mr. Broadnax's trial would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

## II.

It is also important to remember that the universe of evidence that may be considered mitigating is vast and the sentencer is entitled to hear that evidence. At several points in Mr. Broadnax's Rule 32 proceedings, the court appeared to think otherwise.

For example, when Mr. Broadnax's postconviction counsel asked Broadnax's sister, Annette McKinstry, about Broadnax's relationship with her children, the Rule 32 court interrupted to ask, "Why is this important?" The court

accepted Annette's testimony as proffered testimony only, and then said it had heard all it needed to hear about Mr. Broadnax's home life. This effectively dismissed all remaining testimony on this topic. Next, during another witness's testimony, postconviction counsel attempted to ask questions to rebut the state's theory that Jan was going to divorce Mr. Broadnax. The Rule 32 court said, "I'm not dealing with that today," and counsel ended the direct examination. In yet another instance, during Mr. Broadnax's nephew's testimony about what a good influence Broadnax was on him, the Rule 32 court said:

> I'm not trying a trial, guys, you know. I'm not the trial judge. This is a Rule 32 hearing. The allegation was that he had ineffective assistance of counsel and was therefore denied a fair trial. . . . That's all I want to hear about, evidence towards that. <u>I don't want to hear about what a nice guy he is over there.</u> I don't need to hear that.

Finally, when postconviction counsel attempted to present testimony to corroborate the fact that Mr. Broadnax grew up in an impoverished environment where gang activity was present, the Rule 32 court sustained the state's relevance objection. In response to that ruling, Mr. Broadnax's counsel tried to create a record to show this witness grew up near Broadnax's childhood home, but the Rule 32 court dismissed the testimony because "[e]verybody knows" that area of town. And finally, when counsel attempted to show Mr. Broadnax grew up impoverished and without any

structure from his parents in a housing project, the Rule 32 court again dismissed the testimony, saying:

> [F]or the record, I grew[]up in that same neighborhood on 2nd Street North.  Not two blocks from Elyton Village. Judge Houston Brown grew[]up three blocks from Elyton Village, right there off Center Street.  And Judge Helen Shores Lee, also a Circuit Judge, grew up across the street from Judge Brown.  And numerous other doctors, and other professionals grew up out of that same community, and went on to be successful, facing whatever influences was in that area.  And I would, if I had to guess -- Well, I won't do that. . . . [P]eople have to be responsible for their own behavior[.]

"'The purpose of [mitigation] investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense.'"  Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003) (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).  In other words, "[t]he purpose of mitigating evidence is precisely to show that the defendant is a good person." Chandler v. United States, 218 F.3d 1305, 1353 (11th Cir. 2000) (en banc) (Barkett, J., dissenting).  As a result, mitigating evidence may include "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965 (1978).

41

But when "[a] process . . . accords no significance to relevant facets of the character and record of the individual offender," it excludes from the sentencer's consideration "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976). Preventing the jury from hearing—and on postconviction review, the petitioner from presenting—relevant mitigating evidence results in treating the defendant as one member of "a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." Id.; see also Eddings v. Oklahoma, 455 U.S. 104, 114–15, 102 S. Ct. 869, 876–77 (1982) (holding that the sentencer and a reviewing court may determine the weight to be given relevant mitigating evidence, but may not give it no weight by excluding such evidence from consideration). It is by now well established that because imposition of a death sentence means the State will be taking a life, "the sentencer in capital cases must be permitted to consider any relevant mitigating evidence." Abdul-Kabir v. Quarterman, 550 U.S. 233, 248, 127 S. Ct. 1654, 1665 (2007) (quotation marks omitted).

I believe the Rule 32 court made consequential mistakes here, albeit not mistakes that federal courts are allowed to address in the habeas context. The evidence that Mr. Broadnax's postconviction counsel sought to present was

42

indisputably relevant mitigating evidence.  See Eddings, 455 U.S. at 115, 102 S. Ct. at 877 ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.").  But the Rule 32 court repeatedly hindered counsel from presenting—and at times even excluded—this relevant evidence.  Doing so is contrary to the clearly established precedent described above.

*    *    *

Had it not been for the application of a now obsolete evidentiary rule and the Rule 32 court's skewed view of what qualifies as mitigating evidence, Mr. Broadnax may well have met success in pursuing his habeas claims.  Although the standard of review that governs here requires us to affirm the denial of the claims Mr. Broadnax has raised on appeal, I recognize that Broadnax faced burdens throughout his habeas proceedings in putting forth evidence that would have impacted his ineffective assistance claims, and as a result, the resulting sentence he now faces.